Timothy J. SAVAGE

v.

COMMONWEALTH OF PENNSYLVANIA; the Honorable Richard Thornburgh, Governor; Robert C. Wilburn, Secretary of Budget and Administration; Christ J. Zervanos, Bureau of Labor Relations, Office of Administration; Pennsylvania Liquor Control Board; Daniel W. Pennick, Chairman and Ralph O. Barnett, in their official capacities as members of the Pennsylvania Liquor Control Board.

Civ. A. No. 79–1660.

United States District Court,
E. D. Pennsylvania.

Aug. 15, 1979.

526

Richard Kirschner, Jonathan K. Walters, Philadelphia, Pa., for plaintiff.

Richard H. Glanton, Harrisburg, Pa., for defendants.

OPINION

LUONGO, District Judge.

The plaintiff in this civil rights action is a former hearing examiner for the Pennsylvania Liquor Control Board who contends, inter alia, that his termination from that position infringed his first amendment rights to political expression and association.[1] The named defendants are the Com-

---

1. The complaint contains four counts. In addition to the claimed infringement of his first amendment rights, Savage also alleges violations of the equal protection and privileges and

monwealth of Pennsylvania, the Pennsylvania Liquor Control Board, the Governor, the Secretary of Budget and Administration, the Director of the Bureau of Labor Relations, and two members of the Liquor Control Board. Jurisdiction is predicated on 28 U.S.C. §§ 1331(a), 1343(3) (1976), with 42 U.S.C. § 1983 (1976) as the remedial vehicle. The action is currently before me on plaintiff's motion for preliminary relief. After evaluating the evidence adduced at the hearing on preliminary injunction, which was held on June 6, 1979, and after considering the arguments advanced in the memoranda submitted by the parties, I conclude that preliminary relief is warranted under the circumstances of this case.

There is virtually no dispute about the facts surrounding Savage's termination.[2] Savage, who has been a member of the Pennsylvania Bar since 1971, served as a hearing examiner for the Pennsylvania Liquor Control Board (LCB) from April 1977 to March 21, 1979. During that period he received two evaluations, both of which evidence that his performance as a hearing examiner was wholly satisfactory. Plaintiff's Exhibits No. 7, 8. On March 19, 1979, Savage received a call from the office of Murray Dickman, the Deputy Executive Assistant to the Governor, and agreed to a meeting with him on March 21, 1979. Dickman's office did not at that time inform Savage of the purpose of the meeting. On the morning of March 21, 1979, Savage appeared at Dickman's office in Harrisburg; he finally met with Dickman and Richard Glanton, the Governor's counsel, in the early afternoon. The upshot of that meeting was Savage's termination as an LCB hearing examiner.

During the meeting, Dickman informed Savage that Savage's partisan political activities in connection with a special election

that was to be held on March 27, 1979, had recently come to Dickman's attention. Savage acknowledged that he was a Democratic Party ward leader and that he had been actively campaigning for the Democratic candidate in the fifth senatorial district. Savage also acknowledged that he was a Democratic Party candidate for city council. After Savage confirmed Dickman's understanding of Savage's role in the then-upcoming election, Dickman proffered a letter of resignation that he had prepared prior to the meeting. Savage read the letter and refused to sign it. Dickman then handed Savage a letter of termination bearing the Governor's signature.[3]

Savage contends that his termination for having exercised his first amendment right to political expression is constitutionally impermissible under the doctrine enunciated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The defendants counter this argument on two grounds. First, they contend that Savage was terminated pursuant to the Governor's policy against partisan political activity by government employees. They assert that this policy was nonpartisan in application, similar to the constitutionally permissible prohibitions contained in the Hatch Act. Second, they argue that Savage does not come within the *Elrod* doctrine because he is a policy-making, confidential employee.

## I. JURISDICTIONAL IMPLICATIONS OF THE ELEVENTH AMENDMENT

Before I consider the relative merits of these arguments, I must first address a jurisdictional question that is raised by the presence here of the Commonwealth and the LCB. That question is whether the eleventh amendment bars suit against these institutional defendants. Sometime after

immunities clauses as well as denial of procedural due process.

2. The parties have stipulated to the allegations contained in ¶¶ 1, 2, 4–6, 9–15, and in the first sentence of ¶ 3 of the complaint (Document No. 1). N.T. (Document No. 6) at 3–4.

3. The letter, which is typed on the Governor's letterhead, is addressed to Savage and is dated March 21, 1979. Plaintiff's Exhibit No. 9. The body of the letter comprises the single sentence: "You are hereby terminated as a Liquor Control Board Examiner, effective immediately." *Id.*

the hearing on preliminary injunction, I requested additional briefing on the eleventh amendment issue, but only insofar as the problem of immunity might affect the relief potentially available to plaintiff should be succeed on the merits.[4] After reviewing the most recent Supreme Court pronouncements on the relationship between the eleventh amendment and section 1983 (on which plaintiff relies herein), however, I conclude that the eleventh amendment has more serious and wider-ranging implications than I had immediately perceived. The question of eleventh amendment immunity does not color just the remedial phase of litigation, it surfaces at an even more fundamental stage. I refer, of course, to the initial exercise of jurisdiction over the Commonwealth and the LCB. Neither of these two defendants has moved for dismissal on this ground. Nevertheless, because the issue of eleventh amendment immunity is "not merely academic [but rather] 'sufficiently partakes of the nature of a jurisdictional bar,'" see *Alabama v. Pugh,* 438 U.S. 781, 782 & n.1, 98 S.Ct. 3057, 3058, & n.1, 57 L.Ed.2d 1114 (1978) (quoting *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)), I may, and do, raise the question on my own motion.

My inquiry proceeds from the premise that absent consent to suit by the state or clear abrogation of the immunity by Congress, the eleventh amendment insulates from suit both the state and governmental units that are extensions of the state. *Alabama v. Pugh, supra,* 438 U.S. at 782, 98 S.Ct. 3057, *cited with approval in Quern v. Jordan,* 440 U.S. 332, 339–40, 99 S.Ct. 1139, 1144–45, 59 L.Ed.2d 358 (1979); *see Skehan v. Board of Trustees,* 590 F.2d 470, 488–91 (3d Cir. 1978), *cert. denied,* —— U.S. ——, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979) (No. 78–1719); *Flesch v. Eastern Pa. Psychiatric Institute,* 434 F.Supp. 963, 976–77 (E.D.Pa.1977). *Compare Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), *with Edelman v. Jordan, supra,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. Plaintiff argues by analogy to *Fitzpatrick v. Bitzer, supra,* that inasmuch as section 1983 is an exercise of congressional authority under section 5 of the fourteenth amendment, section 1983 abrogates the Commonwealth's eleventh amendment immunity. He suggests that the language in both *Fitzpatrick v. Bitzer, supra,* 427 U.S. at 451–52, 96 S.Ct. 2666, and *Edelman v. Jordan, supra,* 415 U.S. at 675–77, 94 S.Ct. 1347, noting that section 1983 does *not* abrogate the states' eleventh amendment immunity, has been undercut by the decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the Supreme Court overruled the holding in *Monroe v. Pape,* 365 U.S. 167, 187–91, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that municipalities and other local governmental units were not persons within the meaning of section 1983. 436 U.S. at 690, 98 S.Ct. 2018. Plaintiff argues that the Court's prior refusals to construe section 1983 as limiting the eleventh amendment was rooted in the now-rejected rationale of *Monroe v. Pape.* See *Fitzpatrick v. Bitzer, supra,* 427 U.S. at 452, 96 S.Ct. 2666. He contends that

[t]he obvious effect of the court's decision in *Monell* establishing municipalities as 'persons' in 1983 actions is, of course, to recognize the states as equally amenable to [suit]. The syllogism outlined by the court in *Fitzpatrick, supra,* regarding the exclusion of cities in Section 1983 actions and, therefore, the states as well, all of which was predicated upon *Monroe v. Pape, supra,* clearly requires a contrary result in view of *Monell* [, a result that would recognize the Commonwealth as] an appropriate party defendant.

Plaintiff's Additional Memorandum of Law (Document No. 12) at 9.

◼ Any suggestion that *Monell* cast doubt on the Court's prior statements about the impact of section 1983 upon the states' eleventh amendment immunity was effectively foreclosed by the Court in this last term. In *Quern v. Jordan, supra,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358, the Court reinforced the continuing vitality of

---

4. These issues are addressed *infra* in the discussion of irreparable injury.

*Edelman v. Jordan* and its subsequent decisions dealing with the eleventh amendment. After having noted that its holding in *Monell* was " 'limited to local government units which are not considered part of the State for eleventh amendment purposes,' " *id.* at 338, 99 S.Ct. at 1144, the *Quern* majority firmly rejected the argument made by Justice Brennan in his concurring opinion that Congress intended section 1983 to override the states' traditional eleventh amendment immunity. Although the majority agreed that "both the supporters and opponents of the Civil Rights Act of 1871 believed that the Act ceded to the Federal Government many important powers that previously had been considered to be within the exclusive province of the individual States," *id.* at 342, 99 S.Ct. at 1146, they refused to concede that "logic, the circumstances surrounding the adoption of the Fourteenth Amendment, [or] the legislative history of the 1871 Act compel, or even warrant, a leap from this proposition to the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States." *Id.* at 342, 99 S.Ct. at 1146. Pointing to the very limited debate on section 1 of the 1871 Act (the precursor to section 1983), the Court compared the "clearer showing of congressional purpose to abrogate the Eleventh Amendment immunity" relied upon in other cases. *Id.* at 343, 99 S.Ct. at 1146. "By contrast, § 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States." *Id.* at 345, 99 S.Ct. at 1147. Accordingly, I reject plaintiff's argument that section 1983 limits the Commonwealth's eleventh amendment immunity.

As I noted at the outset of this discussion, the eleventh amendment concerns do not simply limit the relief available to a plaintiff. Rather, the eleventh amendment poses an absolute bar to the state's joinder as a defendant. *Quern v. Jordan, supra,* 440 U.S. at 339–40, 99 S.Ct. at 1144–45 (citing with approval *Alabama v. Pugh, supra,* 438 U.S. at 782, 98 S.Ct. 3057). It might perhaps be argued that the Court's allusion in *Alabama v. Pugh, supra,* 438 U.S. at 781, 98 S.Ct. 3057, to the mandatory nature of the injunctive relief ordered in that case somewhat tempers its statement that suit against the State and the State Board of Corrections is barred unless there is consent or waiver of the eleventh amendment immunity. I doubt, however, that the Court intended its conclusion that the eleventh amendment prohibited the initial assumption of jurisdiction over the state and the state agency to depend upon the nature of the relief. Indeed, I think that this conclusion is implicit in the *Quern* majority's unqualified approval of the holding in *Alabama v. Pugh.* 440 U.S. at 339–40, 99 S.Ct. at 1144–45.

The eleventh amendment extends "to *any suit in law or equity,* commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." [5] As the Court noted in *Missouri v. Fiske:*

> The Eleventh Amendment is an explicit limitation of the judicial power of the United States. . . . However important that power, it cannot extend into the forbidden sphere. . . . The "entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against the State without consent given."
>
> . . . . .
>
> The . . . bill is brought by the respondents directly against the State of Missouri. It is not a proceeding within the principle that . . . the exemp-

---

**5.** U.S.Const. amend. XI (emphasis added). Although by its terms the amendment only applies to actions against a state by citizens of another state, the immunity that it confers ex-

tends as well to actions by the defendant state's own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

tion of States from suit does not protect their officers from personal liability to those whose rights they have wrongfully invaded. . . . Here, respondents are proceeding against the State itself . . .

[T]he motive for the adoption of the Eleventh Amendment . . . cannot be regarded, as respondents seem to argue, as restricting the scope of the Amendment to suits to obtain money judgments. The terms of the Amendment . . . were not so limited. *Expressly applying to suits in equity as well as at law, the Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State.*
290 U.S. 18, 25–27, 54 S.Ct. 18, 20–21, 78 L.Ed. 145 (1933) (emphasis added) (citations omitted).

I have no reason to question the current validity of this statement. That the more recent eleventh amendment decisions have focused on the compatibility of the relief ordered with the principles underlying the constitutional grant of immunity is simply a natural consequence of plaintiffs' successful implementation of the *Ex parte Young*[6] rationale. *See generally* Tribe, American Constitutional Law 132–33 & n.23, 144–47 (1978). This modern emphasis in no way overshadows the principles enunciated in *Missouri v. Fiske, supra,* and neither diminishes the force of the eleventh amendment immunity nor circumscribes its reach.

 The import of all this for the instant case is that I am compelled to dismiss those defendants as to which the eleventh amendment operates as a bar to federal jurisdiction. Clearly, the Commonwealth must be dismissed as a party. Equally clearly, so must the LCB. As I noted in *Flesch v. Eastern Pa. Psychiatric Institute, supra,* 434 F.Supp. at 976–77, whether a government agency partakes of the state's eleventh amendment immunity depends upon whether its powers are "sufficiently distinct and independent from the state as not to be considered a part of the state." I have no difficulty concluding that the LCB is an arm of the state for eleventh amendment purposes. Like the Department of Public Welfare, the Psychiatric Institute, and the State Employees Retirement Board in *Flesch, id.* at 977, the LCB is an administrative board "subject to all the provisions of The Administrative Code . . . ." 47 Pa.Stat.Ann. § 2–206 (Purdon 1969). Its powers are statutorily circumscribed, as is its ability to promulgate regulations. *Id.* §§ 2–207 to –208 (Purdon 1969 & Supp. 1979–1980). Although the Board may determine the locations of the state liquor stores, it must lease and equip those stores through the Department of Property and Supplies. *Id.* §§ 2–207(c), (e), 3–301 (Purdon 1969 & Supp. 1979–1980). The financial affairs of the Board and the state liquor stores are monitored by the Department of the Auditor General. *Id.* § 3–306 (Purdon 1969). Not only are the Board members' salaries fixed by statute, *id.* § 2–201 (Purdon Supp.1979–1980), but the Board's operations are totally dependent upon the Commonwealth for its funding and appropriations. *Id.* §§ 744–907 to –910 (Purdon 1969 & Supp.1979–1980). Finally, the fact that the Pennsylvania legislature specifically waived its sovereign immunity with respect to damages caused by the sale of liquor at the state liquor stores under certain circumstances evidences the Commonwealth's understanding that its sovereign immunity and, *a fortiori,* its eleventh amendment immunity, extend to the LCB. *Compare* 42 Pa.Cons.Stat.Ann. § 5110(a)(7) (Purdon 1979) *with* Act of Sept. 28, 1978, Pub.L.No. 788, Act No. 152, § 5(e), *reprinted in* 42 Pa.Cons.Stat.Ann. at 226 (Purdon 1979) ("[n]othing contained in this act shall be construed to waive the Commonwealth's immunity from suit in Federal courts guaranteed by the eleventh amendment to the United States Constitution").

---

**6.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (action against state officer in his individual capacity does not run afoul of eleventh amendment).

While I have no hesitancy in dismissing this action against the institutional defendants, the status of this suit vis-a-vis the individual defendants is less clear. It would appear that the two members of the LCB, who have been named as defendants in their official capacities, *see* Complaint (Document No. 1) ¶ 6, must be dismissed. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permits a suit against state officers in their individual capacities on the theory that the unconstitutional action sought to be enjoined is not sanctioned by the state and that the officers against whom the relief would run are acting as individuals, rather than as officers of the state. *See Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Ex parte Young, supra*, 209 U.S. at 159–60, 28 S.Ct. 441). *See generally* Tribe, American Constitutional Law 129–47 (1978). Conversely, "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . ." *Monell v. Department of Social Services, supra*, 436 U.S. at 690 n.55, 98 S.Ct. at 2036 n.55. Actions against state officials sued in their official capacities therefore run afoul of the eleventh amendment because the state usually is the real party in interest. *See Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Scheuer v. Rhodes, supra*, 416 U.S. at 237–38, 94 S.Ct. 1683. "[W]here the [official] of a State is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think that the State itself may be considered a party on the record." *Governor of Georgia v. Mandrazo*, 26 U.S. (1 Pet.) 110, 124, 7 L.Ed. 73 (1828) (quoted in *Quern v. Jordan, supra*, 440 U.S. at 345–46 n.17, 99 S.Ct. at 1148 n.17.

■ That the state is the real party in interest is apparent when the action seeks an award of money that will come from the state treasury. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Governor of Georgia v. Mandrazo, supra; see Edelman v. Jordan, supra*, 415 U.S. at 663–68, 94 S.Ct. 1347. Clearly, the eleventh amendment bars this type of action, notwithstanding the absence of the state as a named defendant. This notion is consistent with, and reinforced by, the more recent eleventh amendment decisions precluding relief that has a retroactive impact upon the state treasury. It is a little more difficult, however, to reconcile a holding that the eleventh amendment bars, at the outset, an action for injunctive relief brought against state officials in their official capacities with the recent decisions sanctioning, as consistent with eleventh amendment principles, mandatory and other prospective injunctive relief with an ancillary effect upon the state treasury. *Cf. Skehan v. Board of Trustees, supra*, 590 F.2d at 486 ("[t]he eleventh amendment has been construed by the Supreme Court not to bar an action in federal court against the state or its officers acting in their official capacities for prospective injunctive relief"). Nevertheless, the Court has perpetuated what Professor Tribe has termed an "unsatisfactory and conceptually unruly distinction between actions against a state officer individually and actions against the state," Tribe, American Constitutional Law 133 (1978); *see Quern v. Jordan, supra*, 440 U.S. at 345–46 n.17, 99 S.Ct. at 1147–48 n.17, and this distinction has serious consequences for this suit.

■ Plaintiff has chosen to sue these LCB members in their official capacities, and I must assume that their presence as defendants here is because of their "style of office." Certainly, the allegations of the complaint do not lead me to suspect otherwise nor do the facts alleged appear to support a cause of action against the LCB officers in their individual capacities. Indeed, I imagine that they have been joined as defendants solely because they and the LCB are the conduit for the award of back pay for which plaintiff prays. Accordingly, I conclude that under the circumstances presented here, the official capacity suit against the LCB members is in reality a suit against the Commonwealth and must be dismissed.

· Because the complaint does not state whether the remaining defendants are sued in their individual or official capacities, I will construe the complaint in plaintiff's favor and conclude that this action is prosecuted against them in their individual capacities. *See Flesch v. Pa. Psychiatric Institute, supra,* 434 F.Supp. at 979. Consequently, the eleventh amendment does not bar this action against the remaining individual defendants. I therefore turn to the subject matter of the instant motion—the question of preliminary relief.

## II. THE MOTION FOR PRELIMINARY RELIEF

██ Savage prays for immediate reinstatement to his position as an LCB hearing examiner as well as for an injunction against further infringement of his first amendment rights. In order to prevail on a motion for preliminary injunction, plaintiff must demonstrate a likelihood of success on the merits and immediate irreparable injury absent relief *pendente lite. Doe v. Colautti,* 592 F.2d 704, 706 (3d Cir. 1979). In addition to this threshold showing by plaintiff, the court must also consider, where relevant, the possibility of harm to third parties and the effect of the injunction on the public interest. *Id.* at 704 n.5.

Because the inquiry into plaintiff's showing of irreparable harm raises the eleventh amendment considerations to which I have alluded in the discussion on jurisdiction, I will address that issue first.

### *Irreparable Injury*

Plaintiff argues that the abridgement of first amendment rights, of itself, constitutes irreparable injury that mandates injunctive relief. In support of this contention, he relies upon the discussion of the propriety of preliminary injunctive relief by the plurality in *Elrod v. Burns, supra,* 427 U.S. at 373–74, 96 S.Ct. 2673, 2689. In *Elrod* the Court of Appeals for the Seventh Circuit had directed the district court to enter an appropriate order, commenting that:

> [i]nasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases.
> *Burns v. Elrod,* 509 F.2d 1133, 1136 (7th Cir. 1975).

The plurality in *Elrod* agreed with the Seventh Circuit that injunctive relief was appropriate under the circumstances presented in that case. As the plurality opinion noted:

> At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. . . .
> Since such injury was both threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief.
> 427 U.S. at 373–74, 96 S.Ct. at 2689–2690 (citations and footnote omitted).

Plaintiff's case is on a somewhat different footing from that of the *Elrod* plaintiffs. The infringement of first amendment rights in *Elrod* was ongoing at the time plaintiff filed suit. Under those circumstances, *injunctive relief would be appropriate.* The *Elrod* plaintiffs could not be forced to choose between preserving their first amendment rights at the risk of employment and preserving their jobs by sacrificing their first amendment rights. Where plaintiff is faced with such a choice, the

concept of an adequate remedy at law is illusory. Here, however, plaintiff was not given an opportunity to choose between public employment and the exercise of his first amendment rights; he was dismissed outright. To be sure, his first amendment right was burdened in that he was dismissed for his partisan political activity, but at no time was he forced to give up his first amendment rights or threatened with that prospect. Certainly, plaintiff cannot argue that there is an ongoing infringement of his first amendment rights. Although he has lost his position in the public sector, he remains completely free to engage in political activity as he chooses. In these circumstances, *i. e.,* where the loss of public employment has been *accomplished* rather than *threatened,* and where there is, consequently, no *continuing* infringement of constitutional rights, I cannot say that the *past* infringement entirely justifies the preliminary relief requested, namely, immediate reinstatement and an injunction against further infringement. Although a past infringement might, of course, evidence a future threat sufficient to justify an injunction against such infringement, this relief goes hand-in-hand with reinstatement. Unfortunately, a prayer for reinstatement with back pay and damages will generally militate against a finding of irreparable injury sufficient to justify reinstatement preliminary to a determination on the merits on the theory that plaintiff will be fully compensated for his injury after trial. *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). *But cf. Oshiver v. Court of Common Pleas,* 469 F.Supp. 645, 653 (E.D.Pa.1979) (dictum).

■ While I therefore disagree with plaintiff that the past infringement of his first amendment rights will not satisfy the irreparable injury prong of his burden on preliminary injunction, I nevertheless conclude that plaintiff will suffer irreparable injury if he is not immediately reinstated. The reasoning set out above—that a claimant seeking reinstatement is not entitled to preliminary relief because an award of back pay will fully compensate him for his injury—breaks down in this instance where the

eleventh amendment bars such an award. *See Skehan v. Board of Trustees, supra,* 590 F.2d at 485. That the relief is equitable in nature is irrelevant if "[i]t requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation . . . [that] is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman v. Jordan, supra,* 415 U.S. at 668, 94 S.Ct. at 1358.

As I noted earlier, the funding and appropriations for the operations of the LCB, including the salaries of LCB employees, come from the Commonwealth. Clearly, an award of back pay to Savage, although a form of "equitable restitution," would nevertheless be a retroactive award of money damages that has an impact on the treasury of the Commonwealth, and as such, would be prohibited under the *Edelman* rationale. Plaintiff argues, of course, that the continued vitality of *Edelman* has been undercut by *Monell v. Department of Social Services, supra,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 611. I have already addressed and rejected that argument in my discussion of the jurisdictional implications of the eleventh amendment, and any further comment here would simply be repetitive. Because an award of back pay to Savage is barred by the eleventh amendment, it appears that the only viable remedy for plaintiff's alleged unconstitutional discharge is reinstatement. It further appears that any delay in ordering plaintiff's reinstatement will result in harm that is not monetarily compensable, at least not in the nature of an award of back pay.

The possibility of an award of compensatory damages, in the amount of lost pay, against the individual defendants presents the only remaining obstacle to a finding of irreparable injury. Whether the individual officers could be made to respond in damages depends upon whether they would be able to establish that they had acted in good faith and without malice. *Scheuer v. Rhodes, supra* 416 U.S. at 246–49, 94 S.Ct. 1683;

*see Skehan v. Board of Trustees, supra,* 590 F.2d at 485. As this record now stands, it appears that the only individual defendant against whom an award of damages is even a remote possibility is the Governor. Moreover, it appears extremely unlikely that the defense of good faith immunity will be unavailing to the Governor. There is nothing in the evidence to contradict the Governor's contention that he believed that Savage's termination would be constitutional when measured against both the Hatch Act cases[7] and *Elrod v. Burns, supra,* 427 U.S. 347, 96 S.Ct. 2673. Although by the hindsight of a judicial determination the Governor's assessment of the constitutionality of his action may be proved incorrect, this does not necessarily establish the absence of good faith.

■■■ Given this state of affairs, I believe I am justified in concluding that, absent immediate reinstatement, Savage will be irreparably injured. Unlike the situation in *Sampson v. Murray, supra,* 415 U.S. at 90, 94 S.Ct. at 953, the possibility " 'that adequate compensatory or other corrective relief will be available at a later date' " is virtually nonexistent. The only relief compatible with the eleventh amendment concerns is reinstatement, and the availability of a damages award against the individual defendants is extremely remote. Accordingly, I conclude that Savage has demonstrated irreparable injury, and I now turn to the question of his likelihood of success on his challenge to the discharge.

### The Merits of Plaintiff's Claim

Plaintiff argues that his discharge for actively engaging in partisan politics violates the tenets of *Elrod v. Burns, supra,* 427 U.S. 347, 96 S.Ct. 2673. Defendants, on the other hand, advance two arguments to support their contention that *Elrod* is inapplicable to this action. They contend, first, that plaintiff is a policy-making, confidential employee and thus falls outside *Elrod. See id.* at 367–68, 96 S.Ct. 2673; *id.* at 375,

96 S.Ct. 2673 (Stewart, J. concurring). Second, they suggest that the controlling principles may be found in the decisions in *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), which upheld the Hatch Act proscriptions on partisan political activity by public employees. They argue that the policy against partisan political activity pursuant to which Savage was terminated is a neutral policy that applies across-the-board without regard to political affiliation.

Although I agree with defendants that this case does not fit precisely within the strictures of *Elrod,* I nevertheless conclude that plaintiff is likely to prevail on his claim of unconstitutional discharge. I have no difficulty in concluding that an LCB hearing examiner is not a policy-making, confidential employee. It is clear from the testimony of both plaintiff and David Kerr, the Executive Director of the LCB, that hearing examiners have no input into the Board's formulation of policy. Hearing examiners do not make liquor regulations; they simply determine whether the evidence adduced in a given case comports with the applicable legal requirements. They report their findings to the Board along with their recommendations on disposition. It is entirely within the Board's discretion to accept, reject, or modify the recommendations of the hearing examiners. Moreover, the Board does not regularly communicate to the hearing examiner the ultimate disposition in a given matter nor does the Board invite comment on its decision from the hearing examiner involved. That the recommendation of the hearing examiner most probably influences the Board's ultimate decision in the majority of cases does not, in my view, convert what is basically a fact-finding function into a policy-making role.

---

7. *Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

Similarly, I cannot accept defendants' contention that hearing examiners are confidential employees, for defendants link their argument on this score with their contention that plaintiff participates in the formulation of Board policy. They first point to a 1975 directive from the LCB chief counsel advising hearing examiners not to disclose the substance of their reports and recommendations to the hearing participants. They then make the following assertion:

> Defendants do not suggest that an employee's mere access to confidential information in and of itself removes that employee from the purview of *Elrod*. Defendants do, however, submit that the access to confidential nature information inherent in a position is a factor appropriately considered in determining *Elrod's* applicability.

> The focus of *Elrod* is on the employee's duties and his impact upon governmental action. Both the nature of an employee's confidential duties and *his direct role in policy formulation* combine to determine his status under *Elrod*. For example, an employee whose policy-making duties may be borderline under *Elrod* may, in light of his confidential duties, fall outside the category of protected employees. This is precisely true here. . . .

Brief for Defendants (Document No. 9) at 8 (emphasis added). Insofar as defendants premise their argument on a finding of even minimal policy input, it must fail. As I have already stated, I can perceive not the slightest suggestion of the hearing examiners' "direct role in policy formulation" in the evidence so far presented. Both plaintiff's and Kerr's descriptions of the duties of the hearing examiners negate the possibility of such a finding. As the court stated in *Finkel v. Branti*, 457 F.Supp. 1284, 1291 (S.D.N.Y.1978), *aff'd mem.*, 598 F.2d 609 (2d Cir. 1979), *cert. granted,* 443 U.S. ——, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979):

> [a]n employee is a "confidential employee" if he or she stands in a confidential relationship to the policymaking process . . . or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations . . . . .

Because the LCB hearing examiners are not privy to the policy deliberations of the Board either when it renders its decisions or when it promulgates regulations, they do not fit the foregoing description of "confidential employee." Defendants' acknowledgement that merely working with information of a confidential nature does not constitute the type of confidential employee who falls outside the protection of *Elrod* removes the last barrier to a conclusion that Savage is a non-policymaking, nonconfidential employee.

Although Savage therefore ostensibly falls under the *Elrod* umbrella, defendants quite rightly distinguish Savage's discharge from the "patronage dismissal" in *Elrod*. Defendants readily concede that Savage's termination was very definitely precipitated by his partisan campaign activity. They contend, however, that Savage was discharged not because he was campaigning for the Democratic party in a Republican administration (the paradigm patronage dismissal situation) but because he violated the Governor's across-the-board policy against partisan political activity by all public employees.

Defendants rely upon the decisions upholding the Hatch Act restrictions on partisan political activity by government employees to support their argument that Savage's termination was not constitutionally infirm. What defendants have apparently failed to appreciate, or perhaps have deliberately ignored, is that the Hatch Act and the state acts patterned thereon have been *explicit legislative* enactments. This distinction, in my view, presents the central difficulty in resolving Savage's constitutional claim for the facts here comport with neither the *Elrod* nor the *Letter Carriers* model.

Two elementary principles guide the inquiry into Savage's constitutional claim. First, it is firmly established that although a plaintiff has no right to public employment and although he may

therefore be terminated at will, there are nevertheless constitutional constraints on the discharge of public employees. In other words, although plaintiff may be discharged for no reason at all, his continued employment may not be conditioned in a way that impermissibly infringes his first amendment rights. *Elrod v. Burns, supra* 427 U.S. at 356–73, 96 S.Ct. 2673; *accord, Abood v. Detroit Board of Education,* 431 U.S. 209, 234, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Second, the prohibition on the encroachment of first amendment rights is not absolute, and appropriate restraints that advance a governmental interest have been upheld. *E. g., Civil Service Commission v. National Association of Letter Carriers, supra,* 413 U.S. at 556, 93 S.Ct. 2880. These restraints have, however, been subjected to exacting scrutiny, and the burden has been on the government to justify the restraint. *E. g., Elrod v. Burns,* 427 U.S. at 362–63, 96 S.Ct. 2673.

Whether the invocation of this allegedly nonpartisan policy renders Savage's termination constitutionally inoffensive is highly questionable. At the hearing on preliminary injunction, Murray Dickman defined the Governor's policy proscribing partisan political activity. His testimony revealed that the policy had its birth in the Governor's campaign pledge to "remove partisan politics from policy-making positions in State Government." N.T. (Document No. 6) at 73. Although Dickman represented that the policy will eventually extend to all non-Civil Service employees, at the time of its implementation to terminate Savage, the policy applied only to hearing examiners. *Id.* at 84.[8] Moreover, at the time of Savage's discharge, the policy had been neither formally published nor articulated. *Id.* at 75, 83–84. Indeed, the policy was not even directly communicated to Savage prior to his termination. *Id.* at 76–77. In fact, at the time the policy was applied to Savage, it existed only in the minds of the Governor, Dickman, and "people associated with the Governor." *Id.* at 82.

▬▬▬▬ These facts highlight what I believe to be the constitutional infirmities of this "policy" as applied to Savage. Assuming without deciding that the Governor has the power to limit the first amendment rights of non-Civil Service public employees, and assuming further that the policy could be effectuated simply by publication, the *lack* of publication prior to Savage's termination defeats the defendants' argument here. At the very least, a policy that purports to restrict a public employee's right to political expression must be plain and understandable. *Civil Service Commission v. National Association of Letter Carriers, supra,* 413 U.S. at 556, 567, 93 S.Ct. 2880. The governing principle to be gleaned from *Letter Carriers,* which carries the day for Savage, is that while the government may, under appropriate circumstances, condition public employment on the forfeiture of certain rights, the conditions must be communicated to the employee in understandable language before the sanction may be imposed. *Id.* Not only was this policy *not* couched in understandable terms so that an employee might be aware of the proscribed conduct, it was not communicated *in any way* to the employee before his termination. However meritorious defendants' ultimate justification for the implementation of this policy and however appropriate defendants' ultimate analogy to *Letter Carriers* once the policy has been properly implemented, I have no hesitancy in concluding that the application of the policy to Savage on March 21, 1979, impermissibly infringed his first amendment rights.

Because I have concluded that Savage has demonstrated irreparable injury and a likelihood of success on the merits of at least his first amendment claim, I will order his immediate reinstatement. There is no suggestion here of harm to third parties. Although defendants urge that the "public interest" will be harmed if relief is granted, I find their argument on this score unpersuasive. They suggest that

8. This is not to say that an otherwise constitutional policy applicable only to hearing examiners would necessarily offend equal protection principles.

[t]he public, which elected Defendant Thornburgh in part based upon his pledge to end partisan activity of public employees, has an interest in seeing that pledge fully implemented. Moreover, "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispute [*sic*] of its own internal affairs' ",[9] *Sampson*, 415 U.S. at [83, 94 S.Ct. 937], . . . further requires denial of plaintiff's motion.

Brief for Defendants (Document No. 13) at 4.

While defendants may have accurately stated the expectations of the public, the interests outlined above do not outweigh the plaintiff's interest in preliminary relief for the violation of constitutional rights.

In granting plaintiff's motion, I have based my decision on the unconstitutional application of the Governor's "policy" to plaintiff. I do not presently have before me the other issues to which I have briefly alluded in the preceding discussion, *i. e.,* whether the Governor has the power to implement a policy prohibiting public employees from engaging in partisan political activity and whether the policy, if finally implemented, will survive constitutional scrutiny, and I therefore express no opinion on their ultimate resolution at this juncture in the litigation. In order to ensure, however, that plaintiff's reinstatement is not a futile gesture, I will also enjoin defendants from implementing the terms of any alleged policy until such time as it has been adopted and published. This order, of course, in no way affects defendants' right to discharge any "at will" public employee, plaintiff included, for any reason that does not run afoul of the precepts outlined herein.

The foregoing opinion incorporates the findings of fact and conclusions of law as required by Rule 52(a).

### ORDER

This 15th day of August, 1979, it is ORDERED, ADJUDGED AND DECREED:

1. Plaintiff's Complaint is DISMISSED as to the Commonwealth of Pennsylvania, the Pennsylvania Liquor Control Board, Daniel W. Pennick, and Ralph O. Barnett;

2. Defendants shall preliminarily and until final hearing reinstate Plaintiff, Timothy J. Savage, to his position as a hearing examiner for the Pennsylvania Liquor Control Board;

3. Defendants are enjoined from implementing any alleged policy against partisan political activity by Plaintiff until such time as such policy shall have been duly adopted and published.

**9.** The segment quoted properly reads: "the well-established rule that the Government has traditionally been granted the widest latitude in the *'dispatch* of its own internal affairs. . . .' "