Alfred M. BARLETTA and Concetta M. Barletta, his wife, Plaintiffs,

v.

GOLDEN NUGGET HOTEL CASINO, Veronica Bartch, City of Atlantic City, Police Department of Atlantic City, Chief of Police of Atlantic City, Joseph Fair, Elsie Wilson and Laura Cheatum, Defendants/Third Party Plaintiffs,

v.

The STATE OF NEW JERSEY, Irwin I. Kimmelman, Thomas O'Brien, John Sheeran, and John Doe (a fictitious name), Third Party Defendants.

Civ. A. No. 83–0119.

United States District Court, D. New Jersey.

Feb. 6, 1985.

Martin Margolit, P.C., Camden, N.J., for plaintiffs.

Horn, Kaplan, Goldberg, Gorny & Daniels, P.C. by Jack Gorny, Atlantic City, N.J., for defendant, third party plaintiff Golden Nugget Hotel Casino.

Slater & Tenaglia, P.C. by Peter M. Kober, Marlton, N.J., for defendant, third party plaintiff Veronica Bartch.

Gormley, Savio & Gasbarro by William E. Gasbarro, Absecon, N.J., for defendants, third party plaintiffs City of Atlantic City, Chief of Police of Atlantic City, and the Police Dept. of Atlantic City (other than Officers Joseph Fair, Elsie Wilson and Laura Cheatum).

Goldenberg, Mackler & Sayegh by Abigail Sayegh, Atlantic City, N.J., for defendants, third party plaintiffs Joseph Fair, Elsie Wilson and Laurel Cheatum.

Irwin I. Kimmelman, Atty. Gen., N.J. by Rosemarie Ruggiero Williams, Deputy Atty. Gen., Division of Law, Dept. of Law and Public Safety, Trenton, N.J., for third party defendants.

## OPINION

COHEN, Senior District Judge.

This tort and civil rights action is presently before the Court on a motion to dismiss made on behalf of one of the third party defendants, Detective John Sheeran, a member of the New Jersey State Police Department. Sheeran's motion is based entirely upon an · assertion of Eleventh Amendment immunity.[1]

This is another installment in a series of tort cases which has evolved on a busy casino floor, amid the fervor generated by one of the "comparatively innocuous" forms of gambling. *See Champion v. Ames,* 188 U.S. 321, 356, 23 S.Ct. 321, 327, 47 L.Ed. 492 (1903). On October 24, 1982, at approximately 3:00 a.m., an argument arose between the primary plaintiff, Concetta M. Barletta[2], and one of the defendants, Veronica Bartch, over the use of a slot machine at the Golden Nugget Casino (the Casino) in Atlantic City, New Jersey. For some yet unexplained reason, tempers flared and Mrs. Barletta, who may simply have been the prevailing pugilist in the resulting contest, was detained by the Casino's security guards. She was thereafter placed under arrest by defendant, Joseph Fair, an Atlantic City police officer, for simple assault. Apparently, neither Bartch nor Barletta was seriously injured during their hostile encounter. However, Mrs. Barletta claims that she sustained severe injuries and damages at the hands of the police.

The plaintiff maintains that she was unnecessarily and improperly taken to police headquarters before any complaint was signed against her. Further, she claims that, after informing the police of her pre-

---

1. The Eleventh Amendment provides:
   The Judicial power of the United States shall not be construed to extend ·to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

2. Mrs. Barletta's husband, Alfred M. Barletta, alleges that he suffered derivative injuries and sues *per quod.* Hereinafter, references simply to "plaintiff" are references to Mrs. Barletta.

carious health (having recently undergone a colostomy), she was, nevertheless, detained in a cold cell, without adequate clothing, for 6½ hours. Finally, Mrs. Barletta contends that she was subjected to a humiliating strip search by police matrons and defendants herein, Elsie Wilson and Laura Cheatum. Ironically, after having $2,700.00 taken from her at the time she was placed in custody, plaintiff was released when her husband posted $100.00 in bail. In her subsequent trial, held in April of 1982 at the Atlantic City Municipal Court, plaintiff's motion for acquittal was granted at the end of the state's case.

Without admitting the occurrence of a false arrest, the Casino alleges that plaintiff's detention and subsequent incarceration were actions taken at the behest of third party defendant, Detective Sheeran, a state police officer assigned to the Division of Gaming Enforcement (DGE). Pursuant to an agreement among the DGE, the New Jersey State Police, the Atlantic City Police Department and the Atlantic City Prosecutor's Office, all state criminal violations which occur within the confines of a casino are to be investigated by DGE personnel. The Atlantic City Police Department is obligated, by the terms of the same agreement, to assist DGE personnel in the processing. of any person arrested in a casino. Thus, the agreement seems to support, at least at first blush, the contention that Detective Sheeran was in charge of plaintiff's arrest.

In January of 1983, the Barlettas sued both Mrs. Bartch and the Casino for negligence, false arrest and abuse of process. The Barlettas' amended complaint named the City of Atlantic City, its police department and certain individual members of the police force as additional defendants. These additional defendants filed a third party complaint, seeking contribution, against the State of New Jersey, Attorney General Kimmelman, DGE Director Thomas O'Brien, John Doe, an unknown state investigator and, ultimately, Detective Sheeran.

This case has been before the Court previously on five principal occasions. On September 16, 1983, we granted the Casi-no's motion to dismiss based on plaintiff's failure to allege subject matter jurisdiction. After this pleading deficiency was corrected, the Casino moved for summary judgment. On February 15, 1984, 580 F.Supp. 614, we granted this motion in regard to plaintiff's negligence and abuse of process claims but denied it regarding their false arrest claim. On April 27, 1984, these decisions were affirmed upon reconsideration. After the plaintiff had added a civil rights claim, under 42 U.S.C. § 1983, Kimmelman, O'Brien and the State of New Jersey moved to dismiss the third party complaint against them on the basis that it was barred by the Eleventh Amendment. On May 15, 1984, we granted their motion and also granted leave for the Casino to add Detective Sheeran as a third party defendant. Finally, on July 9, 1984, we denied motions for summary judgment made on behalf of the Barlettas and the defendants, City of Atlantic City and the Atlantic City Police Department. Thus, the stage was set for the present motion in which Detective Sheeran claims that he, too, is entitled to the sovereign immunity which underlies the Eleventh Amendment.

## DISCUSSION

Although "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court," *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), it really does not bear on the question of personal or subject matter jurisdiction. *See Petrol Shipping Corp. v. Kingdom of Greece, Ministry of Com.,* 360 F.2d 103, 107 (2d Cir.1966); Wright & Miller, Federal Practice and Procedure: Civil § 1351, at 561. Instead, the Amendment presents a *sui generis* challenge to the jurisdiction of federal courts; suits against states are simply not within the realm of Article III. *See Pennhurst State School & Hospital v. Halderman,* — U.S. ——, ——, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Accordingly, we are not guided on the present motion by either Fed.R.Civ.P. 12(b)(1) or 12(b)(2), which place initial burdens of proof on the party asserting jurisdiction.

■ It is clear that a state official must prove his or her entitlement to official or qualified immunity, *Skehan v. Bd. of Trustees of Bloomsburg State College,* 538 F.2d 53, 62 (3d Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), but it is uncertain whether the same is true when the official asserts the protection of the sovereign. *See Knox v. Regents of Univ. of Wisconsin,* 385 F.Supp. 886, 887 (E.D. Wis.1975) (holding that a plaintiff bears the burden of proving a waiver of sovereign immunity). Fortunately, we may resolve the present controversy without reference to initial burdens of proof.

■ On this preliminary motion, we are required to view the facts under the light most favorable to the nonmoving party. *Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). So construed, it appears that an award of damages against Detective Sheeran would not expend itself on New Jersey's public treasury or interfere with the state's public administration. Accordingly, we shall deny his present motion with prejudice. The discussion which follows explains why these factors are dispositive.

Eleventh Amendment jurisprudence has been aptly and eloquently described by Judge Sloviter, speaking for the Third Circuit, as a "step through the looking glass [which] leads to a wonderland of judicially created and perpetuated fiction and paradox." *Spicer v. Hilton,* 618 F.2d 232, 235 (3d Cir.1980). The esoteric nature of Eleventh Amendment cases is due in part to tensions which inhere in our federalism, principally the interplay between the supremacy of federal law and the sovereignty of states, and in part to the circumstances surrounding its enactment.

The Amendment became effective in 1798 in reaction to *Chisolm v. Georgia,* 2 Dall. 419, 1 L.Ed. 440 (1793), a case in which the Supreme Court assumed original jurisdiction over a suit brought by a citizen of South Carolina against the State of Georgia. Although the Amendment's language merely overruled the result in that particular case, it has never been literally construed. As Justice Powell has recently emphasized, it soon became apparent that the Amendment's "greater significance lies in its *affirmation* that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, ——, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) (emphasis added.) Simply put, the Amendment did not *establish* the sovereign immunity of states; it made clear that the doctrine had survived the Constitution and its "new Federal Government." *See Edelman,* 415 U.S. at 660, 94 S.Ct. at 1354. Some well-established jurisdictional restrictions, which purportedly stem from the Amendment, actually have their origins in the contemplation of the Constitution's draftsmen[3]. For ex-

---

**3.** It is not surprising that the Court's ability to divine Congressional intent, circa 1790, relative to states' sovereign immunity has been questioned. Suggesting that the Eleventh Amendment may be inapplicable to cases based on federal question, subject matter jurisdiction, one commentator noted the following:

We are dealing with a judicially developed "constitutional" rule—but it is a rule that, by its own terms, looks to what the Court has referred to as the "constitutional plan" to allow jurisdiction to be exercised over an unconsenting state in some instances, that recognizes at least some congressional power to impose jurisdiction in still other instances, and that allows jurisdiction to be conferred by the state's consent in all remaining cases. The constitutional core of the rule, in other words, is a bit like the center of an onion.

Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case,* 98 Harv.L.Rev. 61, 68 (1984) (hereinafter cited as Shapiro). Nevertheless, the Court has typically found historical retrospectives to be instructive in determining the proper scope of immunities under § 1983. *See, e.g., Owen v. City of Independence,* 445 U.S. 622, 635, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980). *But cf. Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In a similar, annals retentive vein, we note that the maxim "the King can do no wrong" may have been improperly translated to effect sovereign immunity. The maxim may originally have meant that the King was not privileged to do wrong. *See Mayle v. Pa. Dept. of Highways,* 479 Pa. 384, 388 A.2d 709, 710 n. 6 (1978) (citing Borchard, *Government Liability in Tort, I,* 34 Yale L.J. 1, 2 (1924). We, of course, can only make note of this suggestion.

ample, the Amendment is said to bar suits in admiralty, yet it only speaks of "law or equity." *See Ex Parte Madrazzo,* 7 Pet. 627, 8 L.Ed. 808 (1833). When the Court considered whether a citizen could sue his or her own state, it looked beyond the limited and unambiguous language of the Amendment and prohibited such a suit because it "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890)[4]. In general, the Court has attempted to adhere to "the postulate that the States of the Union still possessing attributes of sovereignty, shall be immune from suits, without their consent, save when there has been 'a surrender of this immunity in the plan of the convention.'" *Monaco v. Miss.,* 292 U.S. 313, 322–23, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1934) (quoting the Federalist, No. 81). In short, from its inception the Eleventh Amendment has provided for a sovereign immunity which is, in some respects, considerably broader than a literal reading of the Amendment would suggest[5].

The impact of the Fourteenth Amendment on state sovereign immunity has been the subject of a line of cases from which we can derive a few, clear principles. Undoubtedly, Congress has plenary power to abrogate states' immunity in order to enforce the substantive guarantees of the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, Congres-

sional intent in this regard must be very clear and in *Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 1144–45, 59 L.Ed.2d 358 (1979), the Court found that Congress did not clearly intend to abrogate states' sovereign immunity when it enacted 42 U.S.C. § 1983. Additionally, New Jersey has not waived its Eleventh Amendment immunity. Thus, we are left with the task of reconciling the Fourteenth Amendment guarantees, which § 1983 was designed to make available, with New Jersey's sovereign immunity in an effort to reach the "appropriate division of responsibility between the federal and state judicial systems." *See Fair Assessment in Real Estate Ass'n., Inc. v. McNary,* 454 U.S. 100, 117, 102 S.Ct. 177, 186, 70 L.Ed.2d 271 (1981) (Brennan, J., concurring)[6].

The principal tool of reconciliation is a determination that a particular suit is not, in fact, one against a state. Although "prior decisions of [the] Court have not been entirely consistent on this issue," *Pennhurst,* —— U.S. at ——, 104 S.Ct. at 908, they are based on sound and enduring perceptions of public policy.

The Court has long recognized that one who acts in a manner contrary to the dictates of his office should not benefit from any immunity accorded that office. Thus, one who acts unconstitutionally may be "stripped of his official or representative character and subjected to the consequences" of his or her conduct. *Id.* (citing *Ex Parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 214 (1908)).[7] This

---

**4.** Justice Brennan has continued to reject *Hans* and its progeny because his inquiry is into the constitutional barriers erected, not evinced, by the Amendment. *See e.g. Pennhurst,* —— U.S. at ——, 104 S.Ct. at 921 (Brennan, J., dissenting).

**5.** In other respects, the evolved immunity is narrower than one might expect. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d, § 3524.

**6.** Absent the need to reconcile the supremacy of federal law with state sovereignty, *i.e.,* when state law is violated, the Eleventh Amendment prohibits federal courts from granting even equitable relief against state officials. *Pennhurst,* —— U.S. at ——, 104 S.Ct. at 909. One commentator has suggested that the *Pennhurst* decision

improperly exalted the doctrine of sovereign immunity to constitutional status instead of utilizing the "more flexible doctrines of construction, comity and restraint." Shapiro, *supra* note 4, at 62. *But cf. McNary,* 454 U.S. at 116, 102 S.Ct. at 186 ("[T]axpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts").

**7.** In *Pennhurst,* the Court "question[ed] the continuing viability of the [*Young*] *ultra vires* doctrine...." —— U.S. at ——, n. 25, 104 S.Ct. at 915 n. 25. The Court did not, however, do more than pronounce *Young* to be "a very narrow exception [to sovereign immunity] that will allow suit only under the standards set forth in *Dugan v. Rank, infra* p. 11."

retroactive divestment could not, of course, be sensibly employed if its effect was to eliminate an underlying federal civil rights cause of action. *See Monroe v. Pape*, 365 U.S. 167, 171–87, 81 S.Ct. 473, 475–84, 5 L.Ed.2d 492 (1961) (§ 1983 provides a remedy when state law is inadequate, invidious, or unenforced). Thus, the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under the color' of state law." *Id.* at 184, 81 S.Ct. at 482 (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). Inevitably, therefore a state official's conduct may constitute state action for Fourteenth, but not for Eleventh Amendment purposes. *E.g., Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 685, 102 S.Ct. 3304, 3315, 73 L.Ed.2d 1057 (1982). The existence of Eleventh Amendment immunity depends primarily on the nature of the relief sought and the identity of the alleged constitutional tortfeasor.

■ A retroactive award, or an award of damages, may be granted by a federal court against a state official in his individual capacity, *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1973), but not in his official capacity because the latter award would necessarily be paid from the state treasury. *Helfrich v. Commonwealth of Pa. Dept. of Military Affairs*, 660 F.2d 88, 90 (3d Cir.1981) (per curiam). Conversely, the cost of complying with a prospective order enforcing federal law may permissibly impose financial burdens, even large ones, on the state treasury. *Hutto v. Finney*, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978).

In this case, we note first that New Jersey is not the real party in interest merely because it was named as a defendant before the complaint was amended to add Detective Sheeran. *See Ramada Inns, Inc. v. Rosemount Memorial Park Ass'n.*,

598 F.2d 1303 (3d Cir.1979). Instead, our inquiry must be into the essential nature of the proceeding.

The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act."

*Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (citations omitted) (cited with approval in *Pennhurst*, —— U.S. at —— n. 11 and —— n. 25, 104 S.Ct. at 908 n. 11 and 915 n. 25).

■ We may consider state law in order to determine whether any judgment versus Detective Sheeran would have to be paid from the state treasury, but the ultimate question of whether Sheeran has Eleventh Amendment protection is one of federal law. *See Blake v. Kline*, 612 F.2d 718, 722 (3d Cir.1979).[8] Detective Sheeran maintains that New Jersey would be required to indemnify him, pursuant to N.J.S.A. 59:10–1, for any award of damages rendered against him. This statute, enacted as part of New Jersey's Tort Claims Act, requires indemnification in any suit in which the Attorney General defends a state employee "on account of an act or omission in the scope of his employment." N.J.S.A. 59:10A–1. Although this term is not defined statutorily, the relevant legislative history makes it abundantly clear that an act involving malice or willful misconduct is not within the scope of a defendant's employment. *See* Report on the New Jersey Tort Claims and Contractual Claims Acts, by Richard J. Hughes, (former) Chief Justice of the Supreme Court of New Jersey, and William F. Hyland, (former) Attorney General of the State of New Jersey, at 238–39; Message on Signing, 59:10A–1, from the Office of the Governor released

---

**8.** In *Blake,* the Third Circuit noted that a hearing often is required before a district court can properly decide whether a complaint asserts an action which relates to the conduct of a sovereign for Eleventh Amendment purposes. 612 F.2d at 726. In order to reduce the likelihood that a separate hearing was required, the attorneys in this case were asked, in advance of oral argument, to address the factors articulated in *Blake* which are relevant to an action against a state official. The defendant in *Blake* was a state agency.

June 1, 1972. Additionally, at oral argument, counsel for Detective Sheeran agreed that New Jersey would not be required to indemnify him for damages awarded due to wanton misconduct.

Sheeran is accused of wanton and willful misconduct. This allegation is colorable and, for the purposes of the present motion, should be accepted as true. Thus, we find that an award of damages against Sheeran would not necessarily be paid from the state treasury.

Next, we must consider whether an award of damages against Detective Sheeran would "interfere with [the] state's public policy and its administration of internal public affairs." *Blake*, 512 F.2d at 725. *Accord Dugan*, 372 U.S. at 620, 83 S.Ct. at 1006. This inquiry need not detain us for long. Clearly New Jersey has a strong public interest in maintaining order at the casinos in Atlantic City. This agreement between the DGE and the Atlantic County officials, *see supra* p. 1497, was premised upon a conclusion that "as a result of the existence of legalized casino gambling in Atlantic City, there will be a predictable increase in criminal activity in the resort community." However, the contemplated criminal activity had little relation to a shoving match between two women over the use of a slot machine. Even if this case involved allegations of more serious criminal conduct, there is no public policy which would permit prosecution at the expense of federal constitutional rights. Thus, we do not hesitate to refuse to dismiss suit against Detective Sheeran, due to fears that we may hinder proper prosecutorial efforts of the DGE or unduly interfere with the administration of New Jersey's public affairs.

Finally, we note that the third party complaint does not state clearly whether Sheeran is being sued in his individual capacity. Given the facts underlying the complaint and the favorable construction we are required to give it, we do not view this as dispositive. *Accord Savage v. Commonwealth of Pa.*, 475 F.Supp. 524, 532 (E.D. Pa.1979).

This case may involve the flagrant abuse of a police officer's authority. Detective Sheeran was apparently responsible for the initial decisions made in regard to Mrs. Barletta's arrest and incarceration and the State has failed to show when his responsibility terminated. At the same time, there appears to be little likelihood that "enormous fiscal burdens" will be placed on a state's treasury without careful thought or that unwarranted intrusions will be made into a state's public administration. *See Hutto*, 437 U.S. at 697 n. 27, 98 S.Ct. at 2577 n. 27. Notwithstanding significant evolution in the past two decades, section 1983 still "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause...." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (J.L. Hand). On the other hand, we must be careful not to "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Id.* Thus, Sheeran may benefit from a personal, qualified immunity, not at issue on the present motion. The detective need not share in the immunity accorded the sovereign State of New Jersey.

The Court shall enter an appropriate order.