MILWAUKEE COUNTY PAVERS ASSN., a Wisconsin corporation, B.R. Amon & Sons, Inc., a Wisconsin corporation, Barricade Flasher Service, Inc., a Wisconsin corporation, Roddie Beaudoin & Son Co., a Wisconsin corporation, Boulanger Const. Co., Inc., a Wisconsin corporation, Brinkmann Engineering, Inc., a Wisconsin corporation, James Cape & Sons Co., a Wisconsin corporation, Century Fence, a Wisconsin corporation, Earth, Inc., a Wisconsin corporation, Hanz Contractors, Inc., a Wisconsin corporation, Johnson Sand & Gravel, Inc., a Wisconsin corporation, Tom Kuehne Landscape Contractor, Inc., a Wisconsin corporation, La Londe Contractors, Inc., a Wisconsin corporation, Milwaukee General Construction Co., Inc., a Wisconsin corporation, A.E. Oakes, a Wisconsin corporation, Pac–Sac Construction, a Wisconsin corporation, Paving Mix & Construction, a Wisconsin corporation, Pheifer Bros. Const. Co., Inc., a Wisconsin corporation, Reliance Construction Co., Inc., a Wisconsin corporation, Rock Road of Wisconsin, Inc., a Wisconsin corporation, Stoehr Grading Co., Inc., a Wisconsin corporation, Super Excavators, Inc., a Wisconsin corporation, Trierweiler Const. & Supply Co., Inc., a Wisconsin corporation, Vinton Construction Co., a Wisconsin corporation, and, Zignego Company, a Wisconsin corporation, on behalf of themselves and all similarly situated persons, Plaintiffs,

v.

Ronald R. FIEDLER, individually and in his capacity as Secretary of the Wisconsin Department of Transportation, and David Manning, individually and in his capacity as Wisconsin Department of Transportation Minority Business Programs Director, Defendants.

No. 89–C–0177–C.

United States District Court, W.D. Wisconsin.

Feb. 27, 1989.

Joseph W. Melli, John R. Sweeney, Philip J. Bradbury, Melli, Walker, Pease & Ruhly, Madison, Wis., for plaintiffs.

David C. Rice, Office of the Atty. Gen., Madison, Wis., for defendants.

Brady C. Williamson, Linda M. Clifford, La Follette & Sinykin, Madison, Wis., for amici curiae, Wis. Minority Contractors Assoc., Lakeside Pavers, Inc., Platt Constr. Bowles Contracting, Inc., Mews Co's., Inc., Underground Pipeline, Inc.

## ORDER

CRABB, District Judge.

This is a civil action pursuant to 42 U.S.C. § 1983 in which plaintiffs challenge the constitutionality of Wis.Stat. § 84.076(1) and (2), entitled "Disadvantaged business demonstration and training program," which provides that the State of Wisconsin should reserve $4,000,000.00 in construction contracts for "disadvantaged" businesses.[1] Plaintiffs request (1) a per-

---

1. Although it appears that plaintiffs wish to bring their suit as a class action, they have not yet made a formal motion for class certification. Accordingly, at this time plaintiffs are proceed-

manent injunction against enforcement of the statute, (2) a temporary injunction enjoining bid lettings scheduled for February 21, 1989 and March 21, 1989 and execution of bids under the statute, and (3) a declaration that the statute is unconstitutional under the standards for reviewing affirmative action programs articulated recently by the United States Supreme Court in *City of Richmond v. J.A. Croson,* —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[2]

Immediately upon filing, the court established a briefing schedule on plaintiffs' motion for a preliminary injunction. On February 20, 1989, after the plaintiffs had filed a brief in support of their motion but before defendants had replied, plaintiffs requested a temporary restraining order enjoining the bid letting scheduled for the following day. On February 21, 1989, the court held a hearing on the motion at which both sides argued and defendants presented two witnesses. At the conclusion of the hearing, the parties agreed that the court should consider the hearing and pending motion to be requesting a preliminary injunction in lieu of a temporary restraining order.[3] Defendants were given until noon on February 22, 1989 to submit affidavits and briefs in opposition to the motion for a preliminary injunction.

The State of Wisconsin is to be lauded for its efforts to ensure that businesses owned by disadvantaged people will enjoy equal business opportunities in the construction industry. The state has enacted a thoughtfully designed program that will train disadvantaged individuals and businesses in business skills and ensure that they will be able to obtain some state con-

struction contracts. Unfortunately, legislation that is both wise and fair from the standpoint of public policy and morality is not always constitutional. In this case, the challenged Wisconsin statute, despite its worth, is constitutionally suspect. The statute appears to classify individuals on the basis of race, national origin, and gender. The state has not yet put forward the evidentiary showing necessary to find that the classifications are constitutional. Because I find that plaintiffs have a likelihood of success on the merits of their claim and because the other prerequisites to the granting of injunctive relief have been met, plaintiffs' motion for a preliminary injunction will be granted.

Based on the undisputed affidavits and exhibits submitted by the parties and the testimony at the hearing, I find as true the following material facts for the purpose of deciding this motion.

## FACTUAL FINDINGS

Plaintiffs are highway contractors doing business in Wisconsin and qualified to bid on most of the Wisconsin Department of Transportation's highway construction projects. They may not bid on projects authorized by Wis.Stat. § 84.076 because they are not disadvantaged businesses as defined by the statute.

Defendant Fiedler is Secretary of the Wisconsin Department of Transportation. Defendant Manning is Disadvantaged Business Programs Director for the department.

In 1982, Congress enacted the Surface Transportation Assistance Act of 1982,

---

ing on their own behalf and not as representatives of any class.

**2.** In addition, appearing as amici curiae arguing in support of the constitutionality of the statute are the Wisconsin Minority Contractors' Association, Bowles Contracting, Inc., Mews Companies, Inc., Lakeside Pavers, Inc., Payne & Dolan, Inc., Platt Construction, Inc., and Underground Pipeline, Inc. The last four listed companies have been awarded bids under the contested statute. *See Leigh v. Engle,* 535 F.Supp. 418 (N.D.Ill.1982) (district court may grant leave to file amici brief where it deems brief timely and useful). Given the strong interest these entities

have in the outcome of this case, I have considered the arguments in their brief.

**3.** A temporary restraining order is an injunction granted without notice to the adverse party and is limited to ten days' duration. Fed.R.Civ.P. 65(b). A preliminary injunction issues only after notice. Fed.R.Civ.P. 65(a)(1). Where the adverse party has received notice of a motion for a temporary restraining order and a hearing has been held on the motion, it is proper for the court to consider the motion as one for a preliminary injunction. 11 Wright & Miller, Federal Practice and Procedure § 2951.

Pub.L. No. 97–424, 96 Stat. 2097, 2100. The Act required that each recipient of federal aid make reasonable efforts to award at least 10% of those funds to disadvantaged firms, that is, small firms owned and controlled by socially and economically disadvantaged individuals. The Act incorporated the definitions of social and economic disadvantage of section 8 of the Small Business Act, 15 U.S.C. § 637(d) and the regulations promulgated pursuant to it. 49 C.F.R. § 23.

In order to comply with the requirements of the Act, Wisconsin enacted a Disadvantaged Business Enterprise Program. As specified by the Act, the Wisconsin program determined which firms were disadvantaged according to the definitions and criteria established by 49 C.F.R. § 23 and then compiled a list of firms certified as disadvantaged.

Under 49 C.F.R. § 23.62, a firm is disadvantaged if it is small and is owned and controlled by individuals who are socially and economically disadvantaged. The regulation incorporates a presumption that citizens or permanent residents of the United States who are "Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, or Asian–Indian Americans" are disadvantaged. 49 C.F.R. §§ 23.62, 23.-69, appendix A (analysis of §§ 23.62 and 23.69). Other groups or individuals may establish economic and social disadvantage according to the procedures and criteria established in 49 C.F.R. § 23.62 and Appendix C.

All firms seeking to be certified by the state as disadvantaged firms must apply to the Wisconsin Department of Transportation. Each application must include, among other information, the type of equipment the applicants use, ownership of the equipment, experience, bank accounts, tax records, and ownership and management of the business. The department evaluates each application individually.

Currently, approximately 180 firms are certified as disadvantaged business enterprises. A business owned by a member of a group presumed to be disadvantaged is not automatically certified by the depart-

ment. The business must prove that it satisfies the size and ownership and control requirements of 49 C.F.R. § 23.

Since 1982, the Department of Transportation has decertified or denied certification to 353 firms. Approximately 75% of those firms were decertified or denied certification because the department determined that they were "fronts" and were not actually owned and controlled by disadvantaged individuals. Most of the remainder were decertified or denied because they lacked the expertise or resources to operate successfully or they did not actively pursue the certification procedure and supply all the necessary information.

The assumption that a member of a listed minority group is socially and economically disadvantaged is rebuttable. Since 1982, approximately 300 firms have applied for certification and been rejected. Approximately half of the rejected firms were owned and controlled by women. Two prominent and wealthy Black athletes applied and were rejected because the department found that they were not economically disadvantaged. A Black person who did not appear to be Black and was not considered Black by others would not be found to be socially disadvantaged.

Approximately five firms that are not owned by individuals who are members of groups that are presumptively disadvantaged have applied for certification as a disadvantaged business. One of these firms has been found to be disadvantaged. The firm is owned and controlled by a white male disabled veteran of the Vietnam War.

The Wisconsin Department of Transportation spends approximately $300–350 million per year on its highway construction projects. For the past four years, approximately 10% of the construction funds were awarded to disadvantaged firms. More than 90% of the minority firms that have received state funds have been subcontractors working under non-disadvantaged prime contractors. Of the 1,364 prime contracts let for highway projects since 1984, only 67 have been awarded to disadvantaged firms. The non-disadvantaged prime

contractors have complained to the department about the inability of the disadvantaged businesses to perform satisfactorily. Disadvantaged businesses have complained to the department about their inability to compete with non-disadvantaged businesses for prime contracts because of the economic barriers they have encountered.

To remedy these two problems, the Wisconsin legislature enacted the contested demonstration and training program in 1988. 1987 Wisconsin Act 399, codified as Wis.St. § 84.076. The Act states, in relevant part:[4]

> *84.076. Disadvantaged business demonstration and training program.*
>
> *(1) Definitions.* In this section:
>
> (a) "Disadvantaged individual" means a minority group member, a woman or any other individual found to be socially and economically disadvantaged by the department as provided in 49 CFR 23.62, unless successfully challenged as provided in 49 CFR 23.69.
>
> (b) "Disadvantaged business" means a sole proprietorship, partnership, joint venture or corporation that fulfills all of the following requirements, as certified by this department:
>
> 1. Is at least 51% owned by one or more disadvantaged individuals who are U.S. [sic] citizens or persons lawfully admitted to the United States for permanent residence....
>
> 2. Its management and daily business operations are controlled by one or more of the disadvantaged individuals who own it.
>
> 3. It is currently performing a useful business function as defined in s. 560.-036(1)(h).
>
> (c) "Minority Business" has the meaning given under s. 560.036(1)(e)1.
>
> (d) "Minority group member" has the meaning given under s. 560.036(1)(f).
>
> *(2) Administration.* (a) The secretary shall administer a demonstration and training program for the purpose of developing the capability of disadvantaged

businesses to participate in construction projects funded under [specified sections]. Beginning in fiscal year 1988–89 ... the secretary shall allocate $4,000,-000 each fiscal year for the awarding of contracts under this section. The secretary shall attempt to ensure that 75% of the amount so allocated each fiscal year is for the awarding of contracts under this section to minority businesses. The secretary may award 100% of the amount so allocated each fiscal year to one disadvantaged business.

> \*  \*  \*  \*  \*  \*
>
> *(3) Bids, contracts.*
>
> ... The secretary shall establish a list of disadvantaged businesses that are eligible to submit bids for contracts awarded under this section....

The program is in effect only through June 30, 1991. The Department of Transportation plans to audit the program prior to its termination to evaluate its success.

The Department of Transportation hired two firms to manage the projects and develop training requirements. In written materials sent to prospective bidders these firms used the term "minority" businesses, not "disadvantaged" businesses. The department wrote to all potential bidders advising them that in their bid proposals they must change the term "minority" to "disadvantaged" or risk rejection of the bid.

The projects initiated under the program have been targeted in the southeastern portion of the state because of the availability of certified disadvantaged firms in that area. Once the projects were selected, the department informed all certified disadvantaged firms about the program. The department also advertised the existence of the program.

The standards and procedures used to determine which individuals and firms qualify as disadvantaged under § 84.076 are identical to those the state has been using to comply with the Surface Transportation Act.

---

**4.** The training aspects of the program contained in § 84.076(3) and (4) have not been challenged in this action.

Under the department's bid letting procedure, advertisements of the bid letting are placed and all disadvantaged firms are notified approximately two months prior to the bidding date. Plans of the projects to be bid are released approximately one month prior to the bidding date. Bids are let the third Tuesday of each month. If the department receives no satisfactory bid on a project, it will relet the bid at a subsequent date.

On January 6, 1989, the department issued a notice of bid opportunities identifying four state highway projects on which only disadvantaged business enterprises could bid individually as a prime contractor. Nine disadvantaged firms were qualified as competent to bid on the projects. Three of these firms were joint ventures. On February 21, 1989, the department let bids on three projects under the program. Each bidder was required to post a bond of approximately $40,000. The low bidders on the three contracts were Underground Pipeline Company, Platt Construction, Inc., and Lakeside Paver, Inc./Payne & Dolan, Inc.

If normal procedures were followed, after the bids were awarded a contract was sent to each bid winner and the $40,000 bonds were returned to all bidders except those to whom the contracts were awarded. The bid winners now have approximately 14 days after the award to execute the contract. Once the contracts are returned to the department, the department staff will review them. The department will then sign the contracts and send them to the governor for approval. The fourth contract under the challenged program is scheduled to be let April 21, 1989.

If the department were required to relet the bids, it would need to re-advertise the projects and re-notify potential bidders. The cost would be $500–$1500 per project. The department might be obliged to repackage the projects as a result of changed time requirements. If it were, the costs of reletting the bids would rise 200–400%. If the department were not able to relet the bids before May, construction would not be completed this year and the costs of the projects could increase substantially.

Two plaintiffs in this case, Pac–Sac Construction and Paving Mix and Construction, were at one time certified as disadvantaged firms. They were decertified after the department determined that they were not actually managed and controlled by disadvantaged individuals. No other plaintiff has applied for certification as a disadvantaged business.

## OPINION

Plaintiffs must establish five elements in order to succeed on a motion for a preliminary injunction: 1) that plaintiffs have no adequate remedy at law; 2) that they will suffer irreparable harm if the injunction is not issued; 3) that the harm to them if the injunction is not granted is greater than the harm to defendants if the injunction is granted; 4) that the injunction will not harm the public interest; and 5) that plaintiffs have a reasonable likelihood of prevailing on the merits. *Brunswick Corporation v. Jones*, 784 F.2d 271, 273–74 (7th Cir.1986). A preliminary injunction is an extraordinary remedy and thus is unavailable unless plaintiffs meet the burden of persuasion as to all of the prerequisites. *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir.1983).

### 1. Likelihood of Success on the Merits

The most vexing question in this case is whether plaintiffs are likely to succeed on the merits of their claim. The issues of the wisdom and validity of affirmative action programs based on benign racial and gender classifications have engendered controversy and passion; the United States Supreme Court has not spoken unequivocally on these questions. In the various plurality and concurring opinions in the most important affirmative action cases, *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), and *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court did not

reach a majority consensus about the proper standard of review applicable to benign racial classifications, the varying power of private and government entities to establish such classifications, the intentions and factual findings needed to support such classifications, or the permissible scope of affirmative action plans. Although the Court's decision in its most recent affirmative action case, *City of Richmond v. J.A. Croson,* —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), answers only some of these questions, it provides the basis for an analysis of plaintiffs' claim. Despite the questions *Croson* leaves unresolved, it clearly modifies the analysis lower courts should apply when reviewing the constitutionality of affirmative action programs. As a result, cases decided before *Croson* are of limited usefulness.

It is not necessary at this stage of the litigation and in the absence of a fully developed factual record to determine definitively this court's understanding of the import and impact of the recently announced decision or whether the challenged Wisconsin affirmative action program is constitutional under the standards it articulates. On a motion for a preliminary injunction, plaintiffs need not show a "substantial" likelihood of success on the merits; the standard is that plaintiffs must show a better than "negligible" chance of success. *A.J. Canfield Co. v. Vess Beverages Inc.,* 796 F.2d 903, 906 (7th Cir.1986). This order sets forth my preliminary understanding of *Croson* and of this case.

a. City of Richmond v. Croson

*City of Richmond v. Croson* concerned a city plan that required prime contractors receiving city contracts to subcontract at least 30% of the dollar amount of the contract to minority businesses. —— U.S. at ——, 109 S.Ct. at 713. A minority business was one at least 51% owned and controlled by minority group members. *Id.* The city defined minority group members as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id.,* citing Ordinance No. 83–69–59. The plan was enacted at a city council meeting at which the council heard

general testimony concerning discrimination against minorities in construction in the city and the nation. The plan contained no geographic limitation. It permitted waivers of the 30% requirement only in exceptional circumstances. It contained no provisions for direct administrative review of a denial of a waiver or of the determination that a firm was or was not minority owned. *Id.* ——, 109 S.Ct. at 713. A nonminority owned prime-contractor challenged the plan as a violation of its right to equal protection under § 1 of the Fourteenth Amendment.

Justice O'Connor's opinion for the Court gained a majority of the justices in only the recitation of the facts of the case and in two of its five analytical sections. After Justice O'Connor presented the underlying facts of the case for a majority of the court, writing for herself and only two other justices, she set the decision in the context of the Court's earlier decisions in *Wygant* and *Fullilove. Croson,* at —— – ——, 109 S.Ct. at 718–19. In *Wygant,* the Court struck down an affirmative action program established by a city school board. 476 U.S. 267, 106 S.Ct. 1842. In *Fullilove,* the Court upheld a congressional spending program setting aside 10% of funds authorized for public works projects for businesses owned by minority individuals. 448 U.S. at 453, 100 S.Ct. at 2726. Justice O'Connor emphasized that these differing outcomes were mandated largely by the differing powers of Congress and states and local governments under the Fourteenth Amendment. Based on a historical distrust of the states in the matter of race, in section 1 of the Amendment the framers of the reconstruction amendments prohibited the states from depriving any person of equal protection of law. Going further, in section 5 of the Amendment, they granted Congress broad power to enforce the equal protection command. —— U.S. at ——, 109 S.Ct. at 720; *see Fullilove,* 448 U.S. at 483–84, 100 S.Ct. at 2777; *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Thus, Congress may enact race-based remedial legislation that

might be impermissible if enacted by a state.

Part IIIA of O'Connor's opinion, joined by three justices, suggested that all racial classifications, including those adopted for remedial purposes, should be subject to strict scrutiny. —— U.S. at —— - ——, 109 S.Ct. at 720–23. She noted that even if a lower level of scrutiny were appropriate where minorities are aided by remedial legislation, that would not be the case in Richmond, where Blacks are a majority, comprising approximately 50% of the city population and holding five of the nine seats on the city council. *Id.* at ——, 109 S.Ct. at 722.

Part IIIB, which gained the support of a majority of the Court, undertakes a searching review of the factual findings underlying the City of Richmond's determination that its plan was necessary to remedy past effects of discrimination against minorities in construction. *Id.* at —— - ——, 109 S.Ct. at 723–28. While not necessarily applying the standard of strict scrutiny suggested by the plurality in Part IIIA, the Court engaged in a more rigorous inquiry into the factual predicate for remedial legislation than it had in prior cases. The Court seemed to look for specific, documented evidence that particular minorities or minority firms were discriminated against in the construction industry in Richmond. To hold that the plan was constitutional, the district court had relied upon five findings: "(1) the ordinance declares itself to be remedial; (2) several proponents of the measure stated their views that there had been past discrimination in the construction industry; (3) minority businesses received .67% of prime contracts from the city while minorities constituted 50% of the city's population; (4) there were very few minority contractors in local and state contractors' associations; and (5) in 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry generally." *Id.* at ——, 109 S.Ct. at 723. The majority found that none of these was sufficient to establish that remedial legislation was necessary. *Id.*

In Part IV, a majority of the Court concluded that the city was required to show that its plan was "narrowly tailored to remedy prior discrimination" and found that it had not made that showing. *Id.* at ——, 109 S.Ct. at 728. The city had not shown that it had considered race-neutral methods of increasing minority participation, that the 30% quota was tailored to a specific goal, or that the plan aided those firms that had suffered from past discrimination in Richmond. In Part V, Justice O'Connor, joined only by Justice Kennedy, suggested what types of state remedial action might be found to be constitutional and emphasized that race-neutral efforts were preferable. *Id.* at ——, 109 S.Ct. at 729.

In this case, plaintiffs contend that the state's disadvantaged business demonstration and training program, Wis.Stat. § 84.076, is unconstitutional under the standards articulated in *Croson* because it excludes plaintiffs from bidding on $4 million of state construction contracts on the basis of their race, gender, or national origin without reliance on any detailed factual findings of prior discrimination in the construction industry in Wisconsin. The state attempts to take the case out of the province of *Croson* and the entire affirmative action quagmire by contending that the program makes classifications based on the non-invidious categories of "social and economic disadvantage" and not based on the suspect classifications of race, gender, or national origin. Although the state's contention is ingenious and appealing, it must ultimately fail. Its failure does not suggest that state programs that reserve special privileges for the socially and economically disadvantaged are constitutionally suspect. "Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution." *Clements v. Fashing,* 457 U.S. 957, 967, 102 S.Ct. 2836, 2845, 73 L.Ed.2d 508 (1981), citing *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). The state's argument fails because neither the language of the relevant state and federal

statutes and regulations nor the state's description of the operation of the program suggests that the classifications of the challenged program are indeed based on the non-invidious and non-suspect classification of disadvantage, *cf. San Antonio School District v. Rodriguez*, 411 U.S. 1, 18–44, 93 S.Ct. 1278, 1288–1302, 36 L.Ed.2d 16 (1972) (disadvantaged poor are not a suspect class), and not race, gender, or national origin.

### b. Basis of State Classification

It appears that under the program the state sets aside $4 million a year of construction contracts for bidding by firms certified to be "disadvantaged."[5] In order to bid for the $4 million of contracts reserved for disadvantaged businesses under

Wis.Stat. § 84.076, a firm must establish that it qualifies as a socially and economically disadvantaged business. A disadvantaged business is a small business that is at least 51% owned and operated by disadvantaged individuals. Wis.Stat. § 84.076(1)(b). A disadvantaged individual is "a minority group member, a woman, or any other individual found to be socially and economically disadvantaged by the department as provided in 49 CFR 23.62, unless successfully challenged as provided in 49 CFR 23.69." A minority group member is a Black, Hispanic, American Indian, Eskimo, Aleut, Native Hawaiian, Asian–American, or Asian–Pacific. Wis.Stat. §§ 84.076(1)(b)(3)(c); 560.036(1)(e)1. The exact parameters of these racial and ethnic categories are defined at 49 C.F.R. § 23.62 (*see, e.g.*,

---

**5.** Inconsistencies exist between the language of the challenged state statute and the state's description of its operation. The statute is entitled *"Disadvantaged* business demonstration and training program." Wis.Stat. § 84.076. Its definitional sections define the terms "disadvantaged individual," "disadvantaged business," "minority business," and "minority group member." Wis.Stat. § 84.076(1)(a)–(d). The statute stated purpose is to develop the capabilities of "disadvantaged" businesses and to this end, it requires the Secretary of the Department of Transportation to allocate $4 million a year to the program and to compile a list of eligible "disadvantaged" businesses. Wis.Stat. § 84.076(2)(a), (3). The statute further provides that "[t]he secretary shall attempt to ensure that 75% of the amount so allocated each fiscal year is for the awarding of contracts under this section to minority businesses. The secretary may award 100% of the amount so allocated each fiscal year to one disadvantaged business." Wis.Stat. 84.076(2)(a). Minority group members are defined as Blacks, Hispanics, American Indians, Eskimos, Aleuts, Native Hawaiians, Asian–Indians, and Asian–Pacifics. Wis.Stat. §§ 84.076(1)(d); 560.036(1)(f).

The facts that the statute contains definitions of both "disadvantaged individual" and "minority group member" and provides that 75% of the contracts should be let to "minority businesses" suggests that most of the contracts are let on the basis of the race and national origin of the bidders. However, witnesses for the state have testified, and the plaintiffs have not contested, that the state has not implemented the provisions relating to minority group members or minority firms and opens all bidding under the program to all businesses certified to be disadvantaged.

The inconsistencies are likely due to the transformations the statute underwent on the journey from bill to law. What became Wis.Stat.

§ 84.076 was originally introduced on March 11, 1988 as part of the Assembly Substitute Amendment 1 to the 1987 Assembly Bill (AB) as a "Minority Business Development and Training Program." In the state's own words, the bill was "a rigid, race-based set aside program for minorities only." Aff. of James S. Thiel, General Counsel of the State of Wisconsin Department of Transportation. Aware that *Croson* was pending before the Supreme Court and that the Court might find the similar Richmond minority set-aside program to be unconstitutional, the Department of Transportation requested that the legislation be amended to be a "disadvantaged business" program designed to aid *"all* disadvantaged businesses." *See* Drafting Request Form for DOT, March 15, 1988; Letter from Secretary of Transportation Ronald Fiedler to State Senator Gary George, April 18, 1988. When the bill was amended to reflect the department's request, all references to minorities were not deleted. *See* Senate Amendment 9 to 1987 Assembly Bill 850 (March 23, 1988); Conference Amendment 5 to Conference Amendment 1 to 1987 Assembly Bill 850 (April 20, 1988); 1987 Wis.Act 399 § 3037(3M).

If the statute is read as it is written, it clearly contains classifications based on gender, race, and national origin. The constitutionality of such classifications will be discussed below. However, in light of the legislative history of the law and the evidence that the state does not operate the program in the manner a plain reading of the statute suggests, for the purpose of evaluating the state's argument that the program discriminates on the basis of economic and social disadvantage and not race, gender or national origin, I will have examined the program as it is actually operated.

§ 23.62(b) defining "Hispanic Americans" as "persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.") 49 C.F.R. § 23.62 also provides that any other minority group or any individual found to be disadvantaged under section 8(a) of the Small Business Act is defined as disadvantaged under the regulation. It appears that no group defined as disadvantaged under 49 C.F.R. § 23.62 or § 8(a) of the Small Business Act is excluded from the listing of minority groups found in the Wisconsin statute. In fact, the state listing of minority groups may be broader than the federal definition. 49 C.F.R. § 23.62 explicitly excludes persons from Burma, Thailand, and Portugal from its definition of minority. *See* 49 C.F.R. § 23, Appendix A (analysis of § 23.62). The state does not appear to have made that same exclusion.

The regulations provide a fairly detailed explanation of the elements of social and economic disadvantage. 49 C.F.R. § 23, Appendix C, §§ (A)–(B). According to the regulations, social disadvantage "must stem from [an individual's] color; national origin; gender; physical handicap; long-term residence in an environment isolated from the mainstream of American society; or other similar cause beyond the individual's control." *Id.* Furthermore, the individual must show a personal experience of social disadvantage that is long-standing and has negatively influenced his or her advancement in business. *Id.* Social disadvantage can be proved by a variety of evidence attesting to the applicant's personal experiences of disadvantage, including denial of access to education, social pressures limiting the applicant's business success, employment discrimination, or exclusion from professional organizations. *Id.*

Economic disadvantage is a secondary determination that may be made only after social disadvantage has been determined. *Id.* The regulations state that "[a]s a general rule, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to

diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged."

Under both the express language of 49 C.F.R. § 23.62 and its appendicies and the state's implementation of Wis.Stat. § 84.076, a minority group member is presumed to be socially and economically disadvantaged. Neither 49 C.F.R. § 23.62 or the regulations promulgated under § 8(a) of the Small Business Act, 13 C.F.R. § 124.105–06, presumes that women are disadvantaged. However, the language of the Wisconsin statute suggests that women should be presumed disadvantaged and the testimony of the director of the disadvantaged business program suggested that the state does presume disadvantage on the basis of gender. A third party, or the state on its own initiative, may challenge the presumption that a woman or minority is disadvantaged by presenting evidence that the individual is not socially or economically disadvantaged. 49 C.F.R. § 23.69.

The presumption that a woman or a member of a minority group is economically disadvantaged can be and has been challenged successfully. In at least a few cases, the state has found that individuals who are socially disadvantaged are not economically disadvantaged. For example, two wealthy Black male athletes were found to be not economically disadvantaged due to their excellent finances and access to credit. However, it does not appear that the presumption of social disadvantage is rebuttable.

The regulations provide a telling example of when the presumption of social disadvantage could be rebutted.

> If an individual has not maintained identification with the group to the extent that he or she is commonly recognized as a group member, it is unlikely that he or she will in fact have suffered the social disadvantage which members of the group are presumed to have experiences. [sic] If an individual has not held himself or herself out to be a member of one of the groups, has not acted as a member

of a community of disadvantaged persons, and would not be identified by persons in the population at large as belonging to the disadvantaged group, the individual should be required to demonstrate social disadvantage on an individual basis.

For example, an individual could demonstrate that he had a Chinese ancestor. However, this hypothetical person has never lived in a Chinese–American community, has held himself out to be white for driver's license or other official records purposes, has not previously claimed to be a Chinese–American, and would not be perceived by others in either the Chinese–American community or non-minority community to be Chinese–American (or any other sort of Asian–Pacific American) by virtue of his appearance, culture, language or associations. The recipient should not regard this individual as an Asian–Pacific American.

49 C.F.R. § 23, Appendix C. The state apparently has applied this understanding of the rebuttable presumption of social disadvantage in its program. In response to a question about when the department would find that a member of a listed minority group was not socially disadvantaged, the director of the state program replied with the example of a Black man who did not appear to be Black, did not hold himself out as Black, and did not identify with the Black community.

A "rebuttable presumption" of this sort is hardly worthy of the term. To "rebut" the "rebuttable presumption" that a member of a minority group is socially disadvantaged the challenger is not asked to show that the individual minority member was not a victim of social disadvantage. If this were the showing, the presumption would be truly rebuttable. A challenger might well be able to prove that a particularly fortunate minority group member suffered no instances of discrimination and no

obstacles attributable to ethnicity or race or gender. However, the challenger is required to make a far greater showing. To rebut the presumption of social disadvantage it must be demonstrated that for all practical purposes the applicant is not a member of the minority group to which he or she claims to belong. A minority group member who does not appear to belong to the group, does not identify with it, is not identified by others as a member of the group, and perhaps holds himself out to be a member of another group can hardly be said to be a member of that group. Thus, for all practical purposes, all members of minority groups are irrebuttably presumed socially disadvantaged for purposes of the statute.[6]

Furthermore, it is not at all clear how a woman could rebut a presumption of social disadvantage. The pertinent federal regulations do not address the question because under those regulations gender is not a relevant classification. The example of rebuttal the state provided for members of minority groups has little applicability to gender issues.

Because the presumption that members of specified minority groups are socially disadvantaged is essentially irrebuttable, I am unable to find that the classifications of Wis.Stat. § 84.076 are based on disadvantage and not race, gender, and national origin. Where race, national origin and gender are proxies for socially disadvantaged, the use of the term socially disadvantaged does not enable the court to ignore that the underlying classification is clearly based on invidious categories.

Some individuals who are not women or members of the identified minority groups may be found to be both socially and economically disadvantaged. Disabled Vietnam veterans, Appalachian white males, Hasidic jews, and others may be able to demonstrate that they are both socially and economically disadvantaged. *See*, 49

---

**6.** Defendants place great weight on the fact that United States Supreme Court and the Court of Appeals for the Fourth Circuit have held that in some contexts only irrebuttable presumptions concerning race are constitutionally infirm. *See Vlandis v. Kline,* 412 U.S. 441, 453, 93 S.Ct.

2230, 2237, 37 L.Ed.2d 63 (1973); *Deel v. Jackson,* 862 F.2d 1079, 1088 (4th Cir.1988). I state no opinion whether the state plan would be constitutional if the state were able to show that the presumption of social disadvantage were actually rebuttable.

C.F.R. § 23, Appendix A (analysis of § 23.62). Wisconsin has found a white male disabled veteran of the Vietnam war to be socially and economically disadvantaged. However, that some non-minorities are found to be disadvantaged, does not alter the fact that *all* minority members and women are found to be socially disadvantaged (unless, of course, it is shown that the minority member or woman is in no way identified with that minority group) and that the statutory classifications are essentially based on race, gender and national origin.

In their artful brief, amici contend that this court is obliged to construe the Wisconsin statute as constitutional if such a construction of the statute is possible. They suggest that the statutory language of Wis.Stat. § 84.076(1)(a), "found to be socially and economically disadvantaged" should be read to modify "not only 'any other individual' but also 'minority group member' and 'woman.' Thus, only socially and economically disadvantaged minorities and women—indeed, only socially and economically disadvantaged *people*—are included in the Program." Although the argument is appealing, it ignores the underlying flaw of the statute as it is written and as the state applies it. The statute defines the term "social disadvantage" in terms of race, gender and national origin. If one is a member of a specific group, one is irrebutably socially disadvantaged.

The legislative history of the challenged statute buttresses my impression that the operative categories of Wis.Stat. § 84.076 are not "disadvantage-advantage" and that the presumption that minorities and women are socially disadvantaged is not intended to be rebuttable in any practical sense. The provisions that were eventually enacted as § 84.076 were originally introduced as a "*Minority* Business Development and Training Program." In order to avoid possible constitutional infirmities with a racial classification, the Department of Transportation suggested that *disadvantaged* be substituted for *minority* and that the administrative rules set out in 49 C.F.R. § 23 apply to determinations of eligibility. Most of the suggested changes were made, but the legislation was not changed in any way that suggests that the program was fundamentally altered.

Furthermore, as I have found, after the legislation was enacted, the Department of Transportation hired two firms to manage the projects and develop training requirements. In written materials sent to prospective bidders these firms used the term "minority" businesses and not "disadvantaged" businesses. This suggests that those working with the program believe that the operative criteria for eligibility were race, national origin, and gender, and not disadvantage. That the department wrote to all potential bidders advising them that in their bid proposals they must change the term "minority" to "disadvantaged" or risk rejection of the bid does not alter this conclusion. That the department realized that it needed to present the program as a *disadvantaged* business program does not lead to the conclusion that in fact the program determined eligibility on the basis of disadvantage and not race, national origin, or gender.

c. Constitutionality of Classifications based on Race, National Origin And Gender

Having determined that under Wis.Stat. § 84.076 women and identified minorities are irrebuttably presumed to be socially disadvantaged and thus that the operative classifications of the statute are based on race, gender, and national origin, I must decide whether such classifications by state legislatures are permissible in the wake of *City of Richmond v. J.A. Croson.*[7]

---

**7.** Although the *Croson* decision speaks in terms of race, it is clearly aimed at classifications based on national origin as well. The Richmond plan included Spanish-speaking, Oriental, Indian, Eskimo, and Aleut persons as well as Blacks. The Court's analysis did not differ where the classifications were arguably based on national origin and not race. *See* —— U.S. at ——, 109 S.Ct. at 728.

Furthermore, *Croson* did not address the issue of classifications based on gender. Because gender classifications are not the focus of the reconstruction amendments and such classifications in non-remedial legislation are not subject

Whatever the ambiguities of the opinion and the various concurrences, it is clear that a majority of the Court believes that state laws employing racial and ethnic classifications must be supported by specific evidence of discrimination in the state against those aided by the statute and be narrowly tailored to remedy those past wrongs. —— U.S. at —— – ——, 109 S.Ct. at 723–29; *see also id.* —— U.S. at ——, ——, 109 S.Ct. at 746, 754 (Marshall, J. dissenting). The evidence of past discrimination may not be cursory or generalized. In *Croson,* the majority rejected the evidence Richmond put forward to support its program. Richmond titled its plan "Remedial"; at the Richmond City Council meeting at which the plan was adopted, proponents of the program stated that racial discrimination existed in the construction business "in this area, and the State, and around the nation"; only .67% of prime contracts were awarded to minority businesses although Blacks constituted more than 50% of the city's population; few minority businesses belonged to local contractors' associations; and Congress, in connection with unrelated federal statutes had found evidence of nationwide discrimination in the construction industry. *Id.* at ——, 109 S.Ct. at 723.

The Court gave little weight to the city's "recitation of a remedial purpose." *Id.* at ——, 109 S.Ct. at 724. The Court characterized the testimony at the city council meeting to be merely "generalized assertion[s]." *Id.* at ——, 109 S.Ct. at 725. It found the statistical evidence unconvincing because "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task"

or eligible for membership in a particular organization, and not the number of minorities in the general population. *Id.* Finally, the Court held that congressional findings of nationwide discrimination were not satisfactory evidence of past discrimination in the City of Richmond. *Id.* at —— – ——, 109 S.Ct. at 726–27.

Furthermore, the Court stressed that while the evidence concerning discrimination against Blacks was unsatisfactory, the evidence including other minorities included in the program was non-existent. "There is *absolutely no evidence* of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aluet persons in any aspect of the Richmond construction industry." *Id.* (emphasis in original).

The State of Wisconsin has not offered the evidence of past discrimination against the identified minorities in the Wisconsin construction industry that is necessary to support the state adoption of racial classifications. The director of the disadvantaged business demonstration and training program has averred that the program was adopted in response to complaints from non-disadvantaged prime contractors that the disadvantaged business sub-contractors were not performing satisfactorily and complaints from disadvantaged businesses that they were not able to qualify for prime contracts due to economic barriers. This evidence is too generalized and conclusory to meet the requirements of *Croson.* It is unknown how many complaints were made, the extent of the problems complained of, the race, national origin or gender of those complaining, or whether specific evidence of discrimination was presented.

However, it may be that the state will be able to put forward evidence of past dis-

to strict scrutiny, *see, e.g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), it may be that gender classifications are not subject to the analysis articulated in *Croson.* At this point in the litigation, it is not necessary to determine the validity of gender classifications separately. It may be that at some point the state will argue that even if the portions of Wis.Stat. § 84.076 based on race and national origin are found to be unconstitutional, the statute's gender classifications should be upheld. Until that time, I will concentrate on the consti-

tutionality of the race and national origin classifications. For the purpose of deciding this motion for a preliminary injunction, the fact that one small portion of the statute which defendants have not in any way emphasized as important may be constitutional, does not provide a basis for finding that plaintiffs do not have a likelihood of success on the merits of their claim that Wis.Stat. § 84.076(1)–(2) violates the equal protection clause of the Fourteenth Amendment.

crimination against the identified minorities in the Wisconsin construction industry. Perhaps the complaints were so extensive and detailed that they provide adequate documentation of discrimination. Or perhaps the state considered other evidence of discrimination before adopting Wis.Stat. § 84.076.[8]

Furthermore, it is not clear that the state must establish that it had the necessary evidence of past discrimination prior to the enactment of Wis.Stat. § 84.076 and that it enacted the legislation as a direct response. Although *Croson* seems to impose what Justice Marshall describes in his dissent as "onerous documentary obligations," the decision does not specify explicitly when the documentation must be made. It may be that the state can show that prior to the enactment of the program the state was in possession of evidence of discrimination against these groups in the state construction industry. That the state may not have explicitly based the remedial legislation on that evidence does not necessarily preclude the state from relying on it now. Alternatively, it may be that the state should be able to submit to this court any evidence it might now have or be able to develop of past discrimination against the identified minorities in the Wisconsin construction industry. Prior to the Supreme Court's decision in *Croson*, states were not obliged to develop a detailed evidentiary record to support a racial classification and therefore had no reason to do so. Thus, it might be proper now that the state is aware of the requirement, to allow it to fulfill it after the enactment of the classification. However, at this stage of the litigation I am not prepared to assume that the state will be able to make the necessary showing, or indeed that it should be permitted to attempt to do so.

The only other evidence in the record even suggesting that such discrimination may exist or may have existed in Wisconsin is the legislative history underlying the federal Surface Transportation Act of 1982 and the regulations it either implements or adopts. *See* 49 C.F.R. § 23; 13 C.F.R. § 124. The Act included a 10% set-aside for disadvantaged businesses. Pub.L. No. 97–424 § 105(f). It appears that all states wishing federal aid for highway construction were required to develop state programs to implement the set-aside requirement. Wisconsin had developed such a program. It was because of the problems the state encountered in this program that it enacted the challenged statute.

When Congress enacted the Surface Transportation Act of 1982 it had before it a history of extensive fact-finding concerning nationwide discrimination against minorities in the construction industry. The origin of the set-aside provision in the Act is identical to that in the Public Works Employment Act of 1977, Pub.L. 95–28, 91 Stat. 116. *Carpenter v. Dole*, slip. op. 85–527–CIV–5 at 22 (E.D.N.C. March 6, 1987). Furthermore, both were linked to § 8(a) of the Small Business Act. *Fullilove v. Klutznick*, 448 U.S. at 463, 100 S.Ct. at 2767; 49 C.F.R. § 23.62. The Supreme Court addressed the constitutionality of the set-aside provision of the Public Works Employment Act of 1977 in *Fullilove* and in a plurality opinion found that it was constitutional. Its constitutionality was premised, in part, upon the extensive fact-finding Congress had made concerning nationwide discrimination in construction. *See* 448 U.S. at 459–67, 100 S.Ct. at 2765–69; *see also id.* at 504–06, 100 S.Ct. at 2787–89 (Powell, J., concurring). Although the state has not commented extensively on the existence of these congressional findings, it may be that defendants will be able to rely upon them.

In *Croson*, the district court judge relied on the congressional findings reviewed in *Fullilove* that nationwide discrimination in construction existed. A majority of the

---

8. Because the state has depended upon its argument that Wis.Stat. § 84.076 does not establish classifications based on race, gender, and national origin, it perhaps has not considered what evidence would be necessary to support such classifications. Thus, although the state has not yet put forward any evidence that it had specific evidence of discrimination in the Wisconsin construction industry and that it enacted the program based on that evidence, it may be able to do so.

Supreme Court found that "[t]he probative value of these findings for demonstrating the existence of discrimination in Richmond is extremely limited." —— U.S. at —— ——, 109 S.Ct. at 726. The Court declined to rely upon the congressional findings because the waiver procedure in the Public Works Employment Act program showed that "Congress explicitly recognized that the scope of the problem would vary" across the nation. *Id.* at ——, 109 S.Ct. at 726. Thus, Richmond could not properly rely on findings of nationwide discrimination to support a finding of local discrimination.

An unpublished decision by the District Court of the Eastern District of North Carolina submitted by defendants, suggests a basis for distinguishing the present case from *Croson* so as to allow the state, and thus this court, to rely upon Congress's nationwide findings. *Carpenter v. Dole,* slip op. 85–527–CIV–5 (E.D.N.C. March 6, 1987). In *Carpenter* several non-disadvantaged construction companies contested, among other things, North Carolina's decision to establish a disadvantaged business program so as to be able to receive federal funds under the Surface Transportation Act of 1982. The North Carolina program was based on the requirements of the Surface Transportation Act and 49 C.F.R. § 23. In response to the plaintiffs' contention that the state plan was constitutionally infirm because there had been no findings of prior discrimination in North Carolina, the district court pointed out that the state plan was not a state program, "but rather is the final step in the implementation of a congressionally created federal remedial action." *Carpenter,* slip. op. at 22. The court found no authority for the position "that a state agency must enter independent specific findings of past state governmental discrimination in order for its voluntary participation in a congressionally enacted remedial program to pass constitutional muster." *Id.* at 23.

*Croson* is not necessarily authority to the contrary. The Richmond plan was not enacted pursuant to any federal legislation. Thus, the Court's decision to discount the "probative value" of the congressional findings in that case does not indicate that where a state program is enacted to implement a federal program the state cannot legitimately rely upon congressional findings of nationwide discrimination.

Of course, the statute challenged in this case is not the Wisconsin statute implementing § 105(f) of the Surface Transportation Act. However, the challenged statute could be considered a mere elaboration on the implementing legislation. After Wisconsin implemented the 10% set-aside provisions of the Surface Transportation Act in order to be eligible for federal highway aid, the state experienced problems with the program. Specifically, non-disadvantaged prime contractors complained that the disadvantaged businesses that they had hired as sub-contractors in order to meet the 10% quota were not performing adequately. Disadvantaged businesses complained that they were unable to become prime contractors as a result of economic obstacles created by their minority status.

In order to address these problems, and perhaps also to improve implementation of federal requirements so as to ensure that Wisconsin would be able to meet them and not risk forfeiting federal highway aid, the state enacted the challenged disadvantaged business demonstration and training program. The legislation sets aside less than 2% of the dollar amount of state construction contracts ($4 million of more than $300 million) to be let solely to disadvantaged businesses. The criteria of eligibility are virtually identical to those of the pre-existing state implementation program as are the procedures used to determine and contest eligibility. In sections of the statute not challenged in this action, specific training programs were established.[9] These

9. Wis.Stat. § 84.076(4) provides:
   Each contractor shall agree to do one of the following in its bids submitted under sub. (3):

(a) 1. Assure that the contractor has developed a program of preapprenticeship training that satisfies the requirements established by the secretary under sub. (2)(b) and has experi-

provisions appear to be closely tailored to the goal of improving the ability of disadvantaged businesses to participate in construction projects let under the requirements of the federal program.

In light of the relation of Wis.Stat. § 84.076 to the state program implementing the Surface Transportation Act of 1982 and to the federal Act itself, it may be possible to regard § 84.076 as a mere elaboration on the federal scheme designed only to implement better the requirements of the federal law. However, none of the parties have suggested this interpretation and virtually no evidence concerning the relationship of the state and federal programs, the percentage of federal funds used in state highway construction, or the relation between the challenged statute and the pre-existing state program is currently before the court. As a result, I decline to find at this time that because the challenged statute is in some fashion implementing a specific federal law the state would be able to rely on congressional findings of nationwide discrimination.

To reiterate, my preliminary understanding of the plaintiffs' likelihood of success on the merits of their claim is as follows. I am unpersuaded that Wis.Stat. § 84.076 determines eligibility for the disadvantaged business program on the basis of disadvantage and not race, national origin, or gender. If the state could show that the presumption that minorities and women are socially disadvantaged is indeed rebuttable, the statute might survive scrutiny. Furthermore, I find that the state has not yet shown or indicated that it will be able to show that the classifications of the statute were based on specific evidence of discrimination in the state. I have not yet determined whether the state is required to have made evidentiary findings

prior to enactment of the statute or whether it may make those findings now and present them to the court. Finally, because no argument or evidence has been presented on the question, I have not determined whether the state may rely on congressional findings of nationwide discrimination to support the constitutionality of its program. Reviewing the foregoing analysis, I conclude that plaintiff's likelihood of success on the merits of their constitutional claim is better than negligible. Accordingly, I will consider the other factors that determine whether plaintiffs' request for a preliminary injunction should be granted.

## 2. Irreparable Harm

In order to prevail on the motion for a preliminary injunction, plaintiffs must also show that they will suffer irreparable harm if the injunction does not issue. Irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir.1984). Plaintiffs allege irreparable harm on two grounds. First, they contend that the alleged violation of constitutional rights constitutes irreparable injury as a matter of law. Second, they contend that if the state executes the contracts that have already been let under Wis.Stat. § 84.076 and it is later found that the statute is unconstitutional and the plaintiffs were entitled to bid on those projects, it will be difficult if not impossible for plaintiffs to establish the amount of damages to which they would be entitled.

■ Plaintiffs' claim is that their right to equal protection of laws guaranteed by the Fourteenth Amendment is violated when they are excluded from bidding on specified state construction contracts because of

ence in providing the training to disadvantaged individuals; and

2. Assure that the contractor has developed and has experience in providing a program of management and technical assistance to disadvantaged business subcontractors. The management and technical assistance program shall satisfy the requirements established by the secretary under sub. (2)(b) and shall include all of the following:

a. On-site administrative support.

b. Assistance with managing scheduling, finances and property.

c. The provision of other management services necessary to assist disadvantaged businesses in developing construction capabilities and opportunities for participation in construction projects.

their race, national origin, or gender. Where violations of constitutional rights are alleged, further showing of irreparable injury may not be required if more than merely money is at stake. *See Jessen v. Village of Lyndon Station*, 519 F.Supp. 1183, 1198 (W.D.Wis.1981) (and cases cited therein); *Walters v. Thompson*, 615 F.Supp. 330 (N.D.Ill.1985); Wright & Miller, Civil § 2948 at 440.

■ Another district court asked to enjoin enforcement of the minority business set-aside goals in an earlier version of 49 C.F.R. § 23 because the regulations were alleged to violate the Fourteenth Amendment held that "equal protection rights are 'so fundamental to our society that any violation thereof will cause irreparable harm irrespective of the financial impact.'" *M.C. West, Inc. v. Lewis*, 522 F.Supp. 338 (M.D.Tenn.1981) (injunction not issued because under earlier law court found no likelihood of success on the merits), quoting *Central Alabama Paving, Inc. v. James*, 499 F.Supp. 629, 639 (M.D.Ala. 1980). I agree. The importance of the alleged infringement is not diminished by the fact that plaintiffs are members of groups that have not traditionally invoked the protections of the Fourteenth Amendment. In light of my finding that after *Croson* plaintiffs' likelihood of success on the merits of their constitutional claim is not negligible, I cannot consider their claim of constitutional right differently from the claim of any other litigant.[10]

Even if the violation of the right to equal protection of law is not an irreparable harm, the difficulty of calculating money damages suggests that plaintiffs could not be made whole by an award of money damages and thus that the injury to them would be irreparable if the injunction does not issue. In their complaint, plaintiffs have not requested monetary relief. This is appropriate because if they were to be successful on the merits of their claim prior to the execution of any contracts under Wis.Stat. § 84.076, they would suffer no monetary damages. Plaintiffs would be entitled to money damages only if their motion for a preliminary injunction were denied, they were to succeed ultimately on the merits of their claim, and the state construction projects were to have proceeded so far that they could not reasonably be re-let under non-discriminatory bidding conditions. Thus, the fact that money damages are not requested in the complaint does not diminish plaintiffs' argument that they may be entitled to money damages and that those damages will be difficult to calculate.

In *Roland Machinery, Co. v. Dresser Industries*, 749 F.2d at 386, the Court of Appeals for the Seventh Circuit noted that "[i]n saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered." The court outlined four instances in which a damage remedy could be inadequate. One was the situation in which the nature of the loss makes damages very difficult to calculate. The court discussed the difficulties encountered in trying to calculate damages for lost profits. *Id.*

Those difficulties are implicated here. To establish money damages, each plaintiff would try to show that if the bidding on the contracts let under Wis.Stat. § 84.076 had been open to all qualified firms, it would have made the low bid and received the contract. Each would then attempt to show what their profit on the construction project would have been. Each firm would have to develop the equivalent of a bid proposal and compare it against those of all other potential bidders. Even then, the damages the party incurred would be entirely speculative. Because it would be so

---

10. Defendants rely extensively on *Jets Services, Inc. v. Hoffman*, 420 F.Supp. 1300 (M.D.Fla. 1976), in which the district court denied the plaintiffs' motion to enjoin the enforcement of the Small Business Administration's disadvantaged business set-aside program (§ 8(a) of the Small Business Act) on the basis that plaintiff would not suffer irreparable harm if the injunction did not issue. *Jets Services* is inapposite because the plaintiff did not claim a constitutional violation, but contended that an agency decision was an abuse of discretion. *Id.* at 1307.

difficult to determine and award damages under these circumstances, it is unlikely that an award, if one could be made, would render any plaintiff whole.

### 3. No Adequate Remedy at Law

The requirement that a preliminary injunction may not issue unless plaintiffs have no adequate remedy at law is closely related to the requirement of irreparable harm. Many courts fuse them into a single requirement. *See Roland Machinery Co.*, 749 F.2d at 383–83, 386 and cases cited therein. In this case, plaintiffs may have no adequate remedy at law for two reasons. First, as discussed above, any money damages that might be available if equitable relief is not forthcoming will not make plaintiffs whole. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952) (inadequate remedy at law where damages are such that measurement is difficult or impossible). Second, the Eleventh Amendment may bar any award of money damages. Some courts have suggested that when the Eleventh Amendment poses such a bar, plaintiff has no adequate remedy at law. *See, e.g., Jessen*, 519 F.Supp. at 1189; *Savage v. Co. of Pennsylvania*, 475 F.Supp. 524, 532–34 (E.D.Pa.1979), *aff'd without opinion*, 620 F.2d 289 (3d Cir. 1980); *Schrank v. Bliss*, 412 F.Supp. 28, 28–40 (M.D.Fla.1979). *But cf. Black United Fund of New Jersey, Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir.1985) (that Eleventh Amendment be an obstacle to recovery of damages in federal court does not transform money loss into irreparable injury). The conjunction of these deficiencies suggests that plaintiffs have no adequate remedy at law.

### 4. Balance of Harms

Having concluded that plaintiffs have a likelihood of success on the merits, that they will suffer irreparable harm if an injunction does not issue, and that they have no adequate remedy at law, I must weigh the harm to the plaintiff that would be incurred by a wrongful denial of a preliminary injunction against the harm incurred by defendants or third parties that could not be cured by prevailing on the merits. *A.J. Canfield Co.*, 796 F.2d at 908. Defendants have shown that if they must re-let the contracts let under Wis.Stat. § 84.076, they will incur an additional cost of $500–$6000 per contract. If the contracts cannot be let before May, the construction costs of these projects may rise substantially. Furthermore, there are the interests of the third-party low bidders who have incurred the cost of bidding for the contracts and now face the prospect of having to re-bid for what they have won, with the possibility they will lose the bid when the number of bidders is increased.

The harm the state and the low bidders will incur is monetary and could be cured by a security bond under Fed.R.Civ.P. 65(c). Furthermore, the state has not shown that the particular projects that it has selected to let under Wis.Stat. § 84.076 are particularly suited to letting under that statute, that they are particularly urgent, or that the state could not choose to let those specific projects under other statutory authorization. Thus, while the harm to the state and the low bidders is not minimal, it does not outweigh the harm plaintiffs will suffer if their constitutional right to equal protection is abridged.

### 5. Public Interest

When as in this case, a preliminary injunction has wide-ranging effects, the court must consider the public interest before granting or denying a motion for a preliminary injunction. *Yakus v. United States*, 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944); *A.J. Canfield*, 796 F.2d at 909; *Roland Machinery, Co.*, 749 F.2d at 388. The wisdom and legitimacy of affirmative action has been hotly debated in the spheres of politics, social science, and law. While politicians and social scientists are free to come to their own conclusions on the matter, lower federal courts are bound by the United States Supreme Court's decision that affirmative action is permissible only within narrowly defined limits. In *Croson*, the Court determined that affirmative action programs not meeting the requirements articulated in that

decision cannot be constitutional. Legislation that is unconstitutional cannot be in the public interest. Because I have found that plaintiffs have a likelihood of succeeding on the merits of their claim that Wis. Stat. § 84.076 is unconstitutional, it follows that enjoining the implementation of statute is in the public interest.

### 6. Bond

■ Plaintiffs request that they be relieved of the obligation to post a security bond for the payment of costs and damages that might be incurred if defendants later prevail on the merits. Fed.R.Civ.P. 65(c) governs the imposition of an injunction bond:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper....

Plaintiffs contend that they should be excused from the requirement because their constitutional rights are at stake and their claim raises issues of general public concern. Where constitutional rights are at stake, the bond requirement may be excused in some cases. *See* 7 Moore's Federal Practice ¶ 65.09 and cases cited therein. However, plaintiffs are far from indigent and have made no showing that the imposition of a bond will chill their attempt to vindicate their rights. Furthermore, in this case defendants will be likely to incur some monetary loss if the injunction is issued. Accordingly, I decline to waive the bond requirement.

Defendants may have until March 3, 1989 to submit briefs and evidentiary materials on the questions whether a bond should be required and what the amount of the bond should be. Plaintiffs may have until March 7, 1989 to submit briefs and evidentiary materials in response.

### ORDER

IT IS ORDERED that plaintiffs' motion for a preliminary injunction is GRANTED.

Defendants are enjoined from executing the three contracts already let under Wis. Stat. § 84.076, from letting any other contracts under the statute, and from implementing the contested provisions of § 84.076 in any other manner.